ROLLINGWOOD CORP. v. COMMISSIONER OF INTERNAL REVENUE.

BOHANNON v. COMMISSIONER OF INTERNAL REVENUE.

Nos. 12728, 12729.

United States Court of Appeals Ninth Circuit.

June 21, 1951.

Justin M. Jacobs, Garret McEnerney II, James Shaughnessy, San Francisco, Cal., for petitioner.

Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, A. F. Prescott, Carlton

Fox and Hilbert P. Zarky, Sp. Assts. to the Atty. Gen. for respondent.

Before BONE and ORR, Circuit Judges, and FEE, District Judge.

BONE, Circuit Judge.

The question to be determined by the petitions for review of a decision of the Tax Court is whether that court erred in determining that the proceeds from the sale of certain houses by the Rollingwood Corporation should be taxed as ordinary income instead of gains from the sale of capital assets. The applicable statutory provision is Section 117(j) of Title 26 U.S.C.A., as added by Section 151(b) of the Revenue Act of 1942, which provides in part:

"(j) Gains and losses from involuntary conversion and from the sale or exchange of certain property used in the trade or business

"(1) Definition of property used in the trade or business. For the purposes of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Such term also includes timber with respect to which subsection (k) (1) or (2) is applicable."

The case was presented to the Tax Court on stipulated facts, a summary of which follows:

Prior to December 7, 1941 David Bohannon, one of the petitioners, was engaged in the real estate business; the business of subdividing and selling real property; and in the business of constructing homes. After the outbreak of World War II he disbanded his sales force and devoted his time and attention to war housing projects including the Rollingwood Project. Prior to the incorporation of the Rollingwood Corporation (referred to herein as Rollingwood) Bohannon was induced by the General Manager of the Richmond shipyards to sponsor a single family dwelling project in Richmond, California. Richmond and the surrounding area was a critical war effort area and suffered from a manpower shortage and inadequate housing. Bohannon was aware of the policy of the United States to provide low-cost rental housing so that war workers would not have to buy homes to stay on the job. Bohannon made two applications to the National Housing Administration and to the War Production Board for priorities and commitments to construct a total of 700 houses in Richmond. The Rollingwood Corporation was incorporated on January 9, 1943 as a California Corporation to undertake the construction and management of this project. The corporation issued fifty shares of common capital stock of a par value of $100 per share. Twenty-six of these shares were issued to Bohannon and twenty-four to Ross Chamberlain, Bohannon's partner in other ventures. On May 10, 1945 Rollingwood re-acquired the twenty-four shares issued to Chamberlain.

Rollingwood acquired a tract of land in Richmond and the construction of the project was commenced in the spring of 1943. The applications for commitments and priorities made by Bohannon were assigned to Rollingwood. Certain conditions were imposed on Rollingwood by virtue of these commitments and priorities. Among them were the following: All of the houses had to be rented with an option to the tenant to purchase; the option was to extend for a period of thirty months; no initial payment could be required other than the first month's rent; the tenant could not be obligated to purchase; the houses could not be disposed of other than in accordance with the required lease without the approval of the Director of Industry Operations of the War Production Board.

The work of subdividing and improving the tract and the construction of the 700 houses was performed for Rollingwood by

the limited partnership of Bohannon and Chamberlain of which Bohannon and Chamberlain were the only general partners. Each of the houses was constructed under a separate Federal Housing Administration Title VI loan made by the Bank of America National Trust & Savings Association to Rollingwood Corporation. As a condition to making the loans Chamberlain and Bohannon were required individually to personally guarantee each loan until the houses were fully completed and fully insured by the Federal Housing Administration.

The 700 houses were completed by August 14, 1943 and were advertised for rent for $50.00 per month. All the houses, upon completion, were rented to war workers under rent-option agreements which agreements were in accordance with the conditions imposed by the United States. Rollingwood never employed any sales force other than general office employees to sell the houses. No "for sale" signs were ever displayed on the houses or on the Rollingwood Tract. By May 31, 1947 Rollingwood had sold 801 houses at a gross profit of $587,234.36. The total number of houses sold exceeded the number constructed because Rollingwood had re-acquired 81 by "repossession" and 24 by "repurchase." It still owned four houses on May 31, 1947. About the latter date the Rollingwood Corporation was dissolved and all its assets distributed to Bohannon. Bohannon, as transferee of the assets, is liable for whatever deficiencies are found to be due.

The Commissioner treated the gains from the sale of the houses as *ordinary income* and assessed a deficiency in Rollingwood's income tax for the fiscal years ending in May, 1944, May, 1945 and May, 1947; and an *excess profits tax* deficiency for the fiscal years ending in May, 1945 and May, 1946. The Tax Court sustained the Commissioner and Bohannon and Rollingwood filed separate petitions for review in this court. The petitions were consolidated on this appeal. Our sole inquiry is whether Rollingwood held these houses primarily for sale to customers in the ordinary course of its trade or business.

The first matter to be considered is the *scope* of review to be given the question by this court. Petitioners contend that as all of the facts are stipulated this court should reach its own conclusions without regard to the findings and conclusions of the Tax Court. We cannot agree. Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., is plain in its requirement that findings of fact shall not be set aside unless clearly erroneous. It is true that where the facts are not in dispute this court may draw inferences of its own. But the ultimate question is whether the findings are supported by the record. In Pacific Portland Cement Co. v. Food Machinery & Chemical Corporation, 9 Cir., 178 F.2d 541, (a case on which petitioners rely) this court said at page 548: "And the question before us, in this—as in all other cases in which findings are required—is whether they are supported in the record." [1]

Coming to the merits the first contention of the petitioners is that the facts necessitate a finding that the houses were constructed primarily for rental purposes. In support of this contention they rely on the facts which show that Bohannon was aware of the "policy" of the United States to provide rental housing for war-workers; that many conditions were imposed on Rollingwood by the United States; that the houses were advertised for rent and actually rented for an average time of twenty-two months under a rental-option agreement which restricted the possibility of sale.

But these facts are not inconsistent with a purpose to sell. It is a logical inference from the above facts that Bohannon and his associate realized that to stay in the building and selling business they would have to engage in housing construction under government priorities and commitments which contained some restrictions. Nor are we convinced that they felt that

1. See also United States v. Fotopulos et al., 9 Cir., 180 F.2d 631, 634; Gillette's Estate v. C. I. R., 9 Cir., 182 F.2d 1010, 1014.

the rental option agreements would tend to restrict sales. It might well be that they contemplated that these agreements would furnish a ready buyer for the individual houses.[2]

■■■ While the purpose for which the property was acquired is of some weight the ultimate question is the purpose for which the property is held. Richards v. C. I. R., 9 Cir., 81 F.2d 369, 106 A.L.R. 249. Most of the cases dealing with the problem of whether property is held primarily for sale to customers in the ordinary course of trade or business involve situations where the taxpayer is engaged in some activity apart from his usual occupation and the question is whether this activity amounts to a business. The test normally applied in these situations is the frequency and continuity of the transactions claimed to result in a trade or business.[3] Applying that test to the facts of the instant case we have no difficulty in finding support in the record for the finding that Rollingwood is in the business of selling real property.[4]

Although the requirements of the statute are to some extent overlapping, the emphasis in this case is whether the houses were held primarily for sale or primarily for rent. Petitioners contend that the word "primarily" means "principal" or "chief," while the Commissioner contends it means "essential" or "substantial." For reasons hereinafter stated we think the latter view is more consonant with the legislative policy.

Suppose the taxpayer in the instant case intended to rent the houses for as long as he was required to do so under existing regulations and then to sell them. Or suppose his intention was to pursue whichever of these activities proved to be the most profitable, that is, if the *rental market* were good he would continue to rent but if the *sales market* were high he would sell. In either of these suppositions we think it is fair to say that one of the essential purposes (in acquiring or holding the houses) is the purpose of sale. Under such circumstances, if the taxpayer does dispose of the houses by sale, is it within the legislative *purpose* to allow him to treat the proceeds of these sales as a capital gain? We think not.

■■ The capital gains provisions are remedial provisions. Congress intended to alleviate the burden on a taxpayer whose property has increased in value over a long period of time from having the profits from sales taxed at graduated tax rates designed for a single year's income. The purpose is to protect "investment property" as distinguished from "stock in trade," or

2. Many of the Tax Court decisions relied on by the petitioner and the case of Fahs v. Crawford, 5 Cir., 161 F.2d 315, are cases dealing with property originally acquired as an investment. No facts in the record in the instant case compel the assumption that the houses involved were investment property.

3. Snell v. C. I. R., 5 Cir., 97 F.2d 891; Miller v. C. I. R., 9 Cir., 102 F.2d 476; C. I. R. v. Boeing, 9 Cir., 106 F.2d 305; Ehrman v. C. I. R., 9 Cir., 120 F.2d 607; Dunlap v. Oldham Lumber Co., 5 Cir., 178 F.2d 781; See also United States v. Robinson, 5 Cir., 129 F.2d 297, where the court said the doctrine had been pushed to extreme lengths in the Ninth Circuit.

4. The following table was compiled from the exhibits by the Tax Court.

| "Fiscal Year Ending | No. of Houses Sold(1) | (2) | (3) | (4) | Gross Profit on Sales |
|---|---|---|---|---|---|
| May 31, 1944 | 32 | 4 | 28 | 0 | $ 15,946.04 |
| May 31, 1945 | 224 | 46 | 175 | 3 | 144,191.74 |
| May 31, 1946 | 357 | 221 | 136 | 0 | 183,421.46 |
| May 31, 1947 | 188 | 15 | 165 | 8 | 243,675.12 |
| Totals | 801 | 286 | 504 | 11 | $587,234.36 |

(1) The total number of houses sold exceeds 700, the number constructed, because the petitioner reacquired 81 houses by repossession and 24 by repurchase. On May 31, 1947, it owned 4 of the houses.

(2) Number of houses sold under option.

(3) Number of houses sold to non-tenants.

(4) Number of houses sold to tenants who rerented without option to buy."

property bought and sold for a profit.[5] It is our view that this policy was not meant to apply to a situation where one of the essential purposes in holding the property is *sale*.[6]

Petitioners contend that the Tax Court reached a different conclusion in Elgin Building Corporation, (1949) Para. 49,015 P-H TC Memo. The Tax Court in that case held that houses that were rented prior to sale were not held primarily for sale but those not rented before sale were held primarily for sale. What we have said above indicates that we reject the reasoning of the Elgin case.

In Delsing et al. v. United States, 5–Cir., 186 F.2d 59, the court held that rental housing built under similar circumstances to those in the instant case was not held primarily for sale. In that case the taxpayer owned twenty-two and one-half houses and sold all but ten, which were retained for rental purposes. The entire group of houses was maintained as rental property for a period of three years, a factor to which the court attached some significance. In the instant case we have frequent and periodic sales commencing in the first fiscal year that the project was in existence and continuing throughout the entire period in question. We think the fact that 28 sales of houses were made in the first fiscal year and 178 sales in the second fiscal year of Rollingwood's existence to persons who did not have rental-option agreements or to whom Rollingwood was under no obligation to sell is very persuasive evidence of the purpose for which the houses were held. Petitioners insist that the sales were passive in that there were no "for sale" signs and no sales force. But the number of sales speak for themselves.

Viewing the activities of petitioners in light of the legislative purpose and policy we are of the opinion that the Tax Court did not err in concluding that the houses in question were held by Rollingwood prima-

rily for sale to its customers in the ordinary course of its trade or business and that the gain from the sales thereof should be taxed as ordinary income. The decision of the Tax Court is affirmed.

---

5. The word investment does not appear in the statute but is frequently referred to by the courts. For a discussion of the entire "Capital Assets" concept see 59 Yale Law Journal pp. 837 and 1057.

6. See Board of Governors v. Agnew, 329 U.S. 441, 67 S.Ct. 411, 91 L.Ed. 408; Greene v. C.I.R., 5 Cir., 141 F.2d 645; But see United States v. Bennett, 5 Cir., 186 F.2d 407.