GREENE-HALDEMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 58732. Filed March 31, 1959.

*Wellman P. Thayer, Esq.*, for the petitioner.
*Donald P. Chehock, Esq.*, for the respondent.

BRUCE, *Judge:* This proceeding involves deficiencies in income tax of petitioner for the years and in the amounts as follows:

---

[5] Amount of petitioner's loan to Max Barish, Inc., not shown.

| Fiscal year ended Sept. 30 | Deficiency |
|---|---|
| 1949 | $1,805.14 |
| 1950 | 1,582.83 |
| 1951 | 10,536.89 |
| 1952 | 34,950.92 |

The questions for decision are (1) whether profits from the sales of certain automobiles held for more than 6 months constitute capital gains under section 117(j), I.R.C. 1939, and, if so, (2) whether certain overhead and administrative expenses incurred in selling such automobiles should serve to reduce the sales price in the computation of capital gains or whether they constitute ordinary business deductions. Petitioner, on brief, has conceded that *direct* selling expenses should serve to reduce the sales price in the computation of capital gains rather than be treated as ordinary business deductions.

### FINDINGS OF FACT.

The stipulated facts are so found and are incorporated herein by this reference.

Petitioner is a California corporation with its principal place of business in Los Angeles, California. It filed its income tax returns for the years involved with the collector of internal revenue for the sixth district of California. Petitioner's books of account were kept and its Federal income tax returns were filed according to an accrual method of accounting and on the basis of a fiscal accounting year ended on September 30.

Throughout the entire period here involved petitioner was a large Chrysler-Plymouth automobile dealer. Petitioner had many of the usual automobile departments, including the sale of new and used cars, parts and service, as well as automobile finance and insurance services. In addition, petitioner also rented some cars for varying periods prior to their sale as used cars, either directly to the lessee or through petitioner's used-car department.

Petitioner's car rentals were of two basic types: (1) Short-term rentals which included those cars rented to customers on a daily, weekly, or monthly basis, and (2) long-term rentals which usually involved 1- or 2-year leases.

The short-term rental business, commenced prior to 1945, was conducted at petitioner's main office in Los Angeles, as well as at approximately eight branch offices, under the copyrighted name of "Call-A-Car System" and was registered with Chrysler Corporation and with the Ford organization. Petitioner's short-term rental cars were rented to customers under written "Motor Vehicle Rental Agreements" and without any option on the part of the renter to purchase the car rented by him.

Petitioner's long-term rental business was commenced in 1949, and was carried on by it under both the name of Greene-Haldeman and the name of "Twelfth Street Auto Rentals," the former name being used in dealing with the renters and in registering the cars, and the latter name being used for internal accounting purposes and in dealing with Chrysler Corporation. The name "Twelfth Street Auto Rentals" was registered both with Chrysler Corporation and with the Ford organization. Generally the deposit on a long-term rental car was approximately half the downpayment required on a credit purchase of a new car.

On the average approximately 50 per cent of all "Rental (long-term) Contracts" entered into by petitioner from August 1949 through September 30, 1952, contained either written options or firm oral options entitling the renter to purchase the leased car. During part of this period (September 19, 1950, to May 7, 1952) a Federal regulation which governed consumer installment credit and cast some doubt on whether petitioner could grant options to purchase was in force. For this reason written options were not always given.

Petitioner's "Rental (long-term) Contracts" required the renter to bring the rented car into petitioner's service department every 30 days for inspection and for service and repair at the renter's expense; petitioner had the right to determine what repairs were necessary.

Monthly rental payments were computed by adding together the following items: The difference between the generally accepted retail selling price of the particular car and its estimated salvage value at the end of the rental term, cost of insurance, licenses, use tax, and interest on petitioner's investment in the car, and by dividing the sum of the foregoing amounts by the number of months in the rental period. If the renter exercised his option to purchase, the price was determined by deducting all rental payments made from retail list price at the time the rental contract was made plus sales tax, license fees, and insurance, plus sales differential, less renter's deposit.

During the 4-year period here involved there was a general scarcity of new and used cars. Consequently the manufacturers were forced to allocate new cars among, and imposed various restrictions concerning their sale on, their dealers.

The long-term rentals inaugurated by the petitioner in 1949, along with its already extant short-term rentals, enabled petitioner to qualify as a "fleet user." This enabled petitioner to obtain more new cars than it could obtain under its limited retail allotments. The "fleet cars" were obtained through the Fargo Motor Corporation (hereinafter referred to as Fargo), a wholly owned subsidiary of the Chrysler Motor Corporation. Under the restrictions of Fargo, the petitioner was generally required to rent the short-term rental cars for at least

6 months, and the long-term rental cars for at least 1 year, before selling them. However, if the petitioner wished to sell a Fargo car before the restricted period expired it could do so and substitute another similar car in its place. After the required rental period expired, Fargo had no further restrictions, and the petitioner could sell the Fargo cars to retail customers as used cars.

A small portion (20 per cent or less) of the fleet car orders under Fargo's method of allocation had to come from the petitioner's monthly retail allotments. During the period here involved it was estimated that the petitioner obtained about 1,200 Fargo cars for its long-term lease operations, and possibly 400 more for other fleet customers. Thus, most of the approximately 1,310 cars added to the rental account during the period here involved were obtained by the petitioner under Fargo's rental restrictions.

Upon expiration of Fargo's minimum lease-time requirements, the rental cars could be purchased by the lessee from the petitioner at any time, whether the lease period had expired or not, and whether the lessee had an option to purchase or not. Similarly, the short-term rentals were also available for purchase at any time, subject only to Fargo's minimum rental requirements.

Petitioner's rental cars were depreciated at the rate of 20 per cent for the first year of service and 12 per cent for the second and subsequent years and the depreciation so computed was claimed by petitioner as a deduction on its income tax returns for the years in question. Petitioner's depreciation rates were based on the anticipated salvage value of the rental cars at the end of the lease term.

If a leased car was sold to the lessee, the sale was referred to as a "lease option sale," and was recorded on the books of the petitioner as a used-car department sale at no profit to the used-car department. If the leased car was not purchased by the lessee but was put in the used-car department of the petitioner for sale, the car was appraised, no further depreciation was claimed on the car, the car was placed in the petitioner's used-car inventory, and its sale thereafter handled the same as any other used car owned by the petitioner, such as trade-ins and used cars purchased for resale. All facilities and services of the used-car department were made available equally for all used cars, including the cars in controversy, such as advertising, salesmen's efforts, used-car showroom and display facilities, as well as overhead, and administrative services and expenses shared in part by the used-car department. During the period here involved the petitioner usually had two teams of six salesmen operating in the new-car department and two teams of six salesmen operating in the used-car department. All selling expenses were treated by the petitioner in its books and on its tax returns as ordinary business deductions, includ-

ing the direct as well as the overhead and administrative selling expenses incurred in the sale of the rental cars here in controversy. The parties have stipulated that the direct selling expenses incurred by the petitioner in selling the used cars retail (including the rental cars in issue, other than those sold to the lessees thereof) during the years involved were as follows:

| Fiscal year ended Sept. 30 | Direct expenses per car |
|---|---|
| 1949 | $66. 65 |
| 1950 | 56. 19 |
| 1951 | 85. 38 |
| 1952 | 90. 48 |

They have further stipulated that the overhead and administrative expenses in selling used cars retail and wholesale (including the rental cars in controversy, other than those sold to the lessees thereof) during the years here involved, were as follows:

| Fiscal year ended Sept. 30 | Indirect expenses per car | |
|---|---|---|
| | Cars sold retail | Cars sold wholesale |
| 1949 | $53. 69 | ------ |
| 1950 | 64. 29 | ------ |
| 1951 | 69. 94 | $23. 31 |
| 1952 | 76. 28 | 25. 43 |

Two hundred and twenty of the 1,012 long-term rental cars placed in rental service by petitioner during the 4-year period beginning October 1, 1948, and ending on September 30, 1952, were purchased by the original lessees thereof at or before the expiration of the rental term. Of the 220 long-term rental cars purchased by the original lessees, 154 were purchased by said lessees under written options to buy, 34 were purchased under oral options, and 10 were purchased without options. (The parties have been unable to locate the files relating to the 22 remaining sales of the 220.) Many of the rental cars sold by the petitioner to buyers other than the lessees, through its used-car department, were cars upon which the lessee, while operating the leased cars, had possessed options to buy.

The following rental cars (held over 6 months unless otherwise indicated) were sold by the petitioner during the years here involved:

| Fiscal year ended Sept. 30 | Rental cars [1] sold retail | Rental cars sold lessees | Rental cars sold wholesale | Rental cars sold (held under 6 months) | Total rental cars sold |
|---|---|---|---|---|---|
| 1949 | 42 | ---------- | ---------- | ---------- | 42 |
| 1950 | 31 | 6 | ---------- | ---------- | 37 |
| 1951 | 113 | 24 | 6 | 22 | 165 |
| 1952 | 238 | 161 | 27 | 12 | 438 |
| Total | 424 | 191 | 33 | 34 | 682 |

[1] Exclusive of rental cars sold to lessees.

The following gross amounts were received by the petitioner from the sale of the 682 cars, formerly rented:

| Year ended Sept. 30 | Number of cars | Short-term car sales | Number of cars | Long-term car sales |
|---|---|---|---|---|
| 1949 | 42 | $61,362.81 | | |
| 1950 | 25 | 37,253.59 | 12 | $21,040.90 |
| 1951 | 69 | 119,494.33 | 96 | 154,726.60 |
| 1952 | 96 | 173,162.11 | 342 | 522,410.04 |

During the same period the total gross sales figures of all new and used cars were as follows:

GROSS SALES

| Year ended Sept. 30 | New cars | | Used cars (includes rental car sales) | |
|---|---|---|---|---|
| | Units | Gross | Units | Gross |
| 1949 | 1,492 | $3,172,117.98 | 954 | $796,199.94 |
| 1950 | 1,181 | 2,725,973.73 | 1,253 | 1,112,093.82 |
| 1951 | 1,460 | 3,603,251.71 | 1,776 | 1,679,648.44 |
| 1952 | 839 | 2,412,690.15 | 2,694 | 3,342,099.19 |

During the 4-year period here involved, the following gross car rentals were received by the petitioner:

| Year ended Sept. 30 | Gross rentals [1] | |
|---|---|---|
| | Short-term car rentals | Long-term car rentals |
| 1949 | $65,679.38 | $313.92 |
| 1950 | 61,184.36 | 112,630.47 |
| 1951 | 108,097.14 | 332,943.85 |
| 1952 | 190,765.77 | 424,548.10 |

[1] The gross rentals shown include the rentals received from all cars rented during the 4-year period extending from Oct. 1, 1948, to Sept. 30, 1952. The figures are not limited to the rentals received from the particular cars here in controversy that were sold during this period. During this period 682 rental cars were sold while 1,310 cars were added to the rental car account.

During the taxable years here involved the relationship of petitioner's operating profit from the operation of its short-term and long-term rental fleets to its total operating profit from all sources was as follows:

| Fiscal year ended Sept. 30 | Short-term rental department operating profit | Long-term rental department operating profit | Total rental operating profit | Total operating profit of business | Percentage of rental operating profit to total operating profit of business |
|---|---|---|---|---|---|
| 1949 | $4,367.08 | ($464.26) | $3,902.82 | $315,638.53 | 1.23 |
| 1950 | 2,704.27 | 13,786.72 | 16,490.99 | 184,780.52 | 8.92 |
| 1951 | 21,860.81 | 76,785.34 | 98,646.15 | 351,849.08 | 28.03 |
| 1952 | 23,213.87 | 203,814.54 | 227,028.41 | 240,687.70 | 94.32 |

The average gross profit from the sale of rental cars was in excess of $300 per car; the average gross profit from the other used cars during the same period was less than $100 per car.

During the fiscal years ended September 30, 1949, 1950, 1951, and 1952, petitioner reported long-term capital gains from the sale of rental cars which had been held for more than 6 months of $13,882.48, $10,720.65, $42,995.72, and $134,169.93, respectively.

Respondent, in his notice of deficiency determined that these gains were includible as ordinary income under section 22(a) rather than as long-term capital gains under section 117.

The rental cars here in question, both long and short term, were at all times here in controversy held primarily for sale to customers in the ordinary course of petitioner's trade or business.

OPINION.

During the period here involved petitioner sold a number of automobiles which it had acquired new and rented to different lessees for varying periods of time. Petitioner contends that those rental automobiles which had been held for more than 6 months prior to sale were "property used in the trade or business" and that therefore profits from their sale qualified for the preferential capital gains treatment under section 117(j), I.R.C. 1939.[1] Respondent maintains that such rental automobiles were property held primarily for sale to customers in the ordinary course of petitioner's trade or business and that profits from their sale come within the exception of section 117(j)(1)(B) and therefore constitute ordinary income under section 22(a). For the reasons set forth below we feel that respondent's position is correct.

Whether property is used in the trade or business or is held primarily for sale to customers in the ordinary course of petitioner's trade or business is a question of fact. *S.E.C. Corporation* v. *United States*, 140 F. Supp. 717, 719 (S.D.N.Y., 1956), affirmed per curiam 241 F. 2d 416 (C.A. 2), certiorari denied 354 U.S. 909; *Harriss* v. *Commissioner*, 143 F. 2d 279 (C.A. 2, 1944).

Many criteria have been employed in resolving this factual question, *inter alia:* The intent of the seller, the purpose or purposes for which the property was acquired, held, and sold; the frequency, continuity, and substantiality of the sales; whether the sales are in furtherance

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation * * * held for more than 6 months * * * which is not * * * (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *

of an occupation of the taxpayer; the proximity of sale to purchase; and the extent of sales activity on part of the seller. See *S.E.C. Corporation* v. *United States, supra; Rollingwood Corp.* v. *Commissioner*, 190 F. 2d 263 (C.A. 9, 1951) ; *Mauldin* v. *Commissioner*, 195 F. 2d 714 (C.A. 10, 1952). All of these criteria should be considered; no single factor can be viewed as dispositive. *S.E.C. Corporation* v. *United States, supra.*

In applying these various factors to the instant case the general purposes of the capital gains provisions must be remembered. In *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52, the Supreme Court succinctly stated these purposes and indicated that section 117 should be narrowly construed:

the capital-asset provision of § 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. Burnet v. Harmel, 287 U.S. 103, 108 * * *. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." Burnet v. Harmel, 287 U.S. at page 106 * * *. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term "capital assets" in § 117. * * *

Petitioner's sales of rental cars were frequent, continuous, and substantial. They were a part of "the everyday operation of a [that] business." During the period here in question petitioner sold 648 rental cars (which had been held for more than 6 months), either to the current lessee, many of whom had options to purchase, or through petitioner's used-car department. The sizable sales force, extensive facilities, and advertising of petitioner's used-car department were devoted without discrimination to the sale of both rental cars and other types of used cars. The profits from the sale of rental cars were considerable. Petitioner averaged approximately $300 profit per sale of each rental car as compared to an average of approximately $100 per sale of other used cars. The sale of rental cars constituted a substantial part of petitioner's used-car and car rental activities.

Generally speaking, during the period here involved there was a short supply of and a high demand for both new and used cars. Automobile manufacturers were forced to allocate new cars among their dealers. By expanding its car rental business during this period petitioner was able to obtain more new cars than were available through its new-car department. Subject only to the manufacturer's

minimum rental-time requirements and existing lease obligations, the rental automobiles were purchasable at any time.

Petitioner's acquisition, holding, and sale of these rental automobiles were accompanied by the ever-present motive of ultimately selling them at retail for profit.

The term "primarily" as it is used in the section 117(j)(1)(B) exception of "[p]roperty held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" has been construed as meaning "substantial" or "essential" rather than "principal" or "chief." See *Rollingwood Corp.* v. *Commissioner, supra;* *S.E.C. Corporation* v. *United States, supra.* We feel that such a construction is reasonable and in keeping with legislative intent.

In the instant case it is clear that petitioner had a dual purpose: rental and sale. The sale of the rental cars was not merely an incidental consequence of rental. Petitioner acquired, held, and sold the rental cars with the primary, essential, substantial, and determining business purpose of selling them to its customers in the ordinary course of its business.

Petitioner relies on *Philber Equipment Corp.* v. *Commissioner*, 237 F. 2d 129 (C.A. 3, 1956), reversing 25 T.C. 88. That case is distinguishable on the record.

Petitioner contends that a comparison of its rental income with the total income from all its activities leads to the conclusion that the rental cars were held for use in its trade or business. We feel that the comparative income criteria alone is not controlling. See *S.E.C. Corporation* v. *United States, supra*, 719, where the court stated:

That sales in a given case bear a small proportion to rentals may be some ground for inferring that they were not a normal source of annual income to that taxpayer. But to consider this more than one possible inference would be to draw an unwarranted conclusion. The statute would become a source of windfalls rather than a relief from hardship. To say, on the other hand, that if sales are an essential part of the taxpayer's business they are a source of ordinary income, is to synthesize the general view that frequent or regular sales conducted with a view to market conditions and the availability of customers normally produce ordinary income.

Upon review of the entire record and upon consideration of all the applicable factors outlined above in light of the general purposes of the capital gains provisions we find that the rental cars in question were held primarily for sale to customers in the ordinary course of petitioner's trade or business. The profits from such sales constitute ordinary income.

In light of our disposition of the primary issue, determination of the alternative issue is not necessary.

*Decision will be entered for the respondent.*