AMERICAN CAN COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 69174.    Filed November 16, 1961.

*Charles C. MacLean, Jr., Esq., John H. Perkins, Jr., Esq.,* and
*Frederick B. Boyden, Esq.,* for the petitioner.
*Dean P. Kimball, Esq.,* for the respondent.

OPINION.

RAUM, *Judge:* 1. *Capital gain.*—Petitioner seeks the benefit of the provisions of section 117(j) of the 1939 Code with respect to the gains upon its 1953 sales of closing equipment. Section 117(j) in effect accords the favored capital gains treatment to profits realized upon the sale of "property used in the trade or business, of a character which is subject to the allowance for depreciation * * *, held for more than 6 months"; but at the same time denies such treatment where the property sold is "(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

The Commissioner argues that section 117(j) is not applicable here because the machines were held primarily for sale to customers in the ordinary course of its trade or business.[1] If the machines were so "held," it is not disputed that the profits on sale must be taxed as ordinary income rather than as capital gains.

It is pertinent to note at the outset that the relief provisions of section 117 are to be "narrowly" construed so as to effectuate the congressional purpose to tax as ordinary income the profits "arising from the everyday operation of a business." *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52; *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, 265.

Prior to the antitrust decree petitioner's closing machines were certainly not held for sale to customers. Indeed, petitioner's policy in respect of closing machines, including its refusal to sell them, was a significant aspect of the Government's antitrust complaint. But the purpose of holding property can change. *C. E. Mauldin*, 16 T.C. 698, 707, affirmed 195 F. 2d 714 (C.A. 10) ; *Joseph A. Harrah*, 30 T.C. 1236, 1241. Accordingly, what is determinative under section 117 is petitioner's purpose or intention with respect to the property held at the time of sale. *Joseph A. Harrah, supra; C. E. Mauldin, supra; Rollingwood Corp.* v. *Commissioner*, 190 F. 2d 263 (C.A. 9), affirming a Memorandum Opinion of this Court. Cf. *Differential Steel Car Co.*, 16 T.C. 413, 416; *Stern Brothers & Co.*, 16 T.C. 295, 313; *Carl Marks & Co.*, 12 T.C. 1196. In this case the sales were made in 1953, during the third year after the effective date of the antitrust decree. Moreover, the statutory requirement that the property be held "primarily" for sale to customers has been construed so as to treat the word "primarily" as meaning "substantial" or "essential" rather than as "principal" or "chief." See *Rollingwood Corp.* v. *Commissioner, supra* at 266; *S.E.C. Corporation* v. *United States*, 140 F. Supp. 717, 719 (S.D. N.Y.), affirmed 241 F. 2d 416 (C.A. 2), certiorari denied 354 U.S. 909; *Real Estate Corporation*, 35 T.C. 610, 615; *Joseph A. Harrah*, 30 T.C. 1236, 1241. And, finally, property may be held with a *dual* purpose; and if one of such purposes is to sell it to customers in the ordinary course of business the sales may fail to qualify for capital gains treatment under section 117(j). *Rollingwood Corp.* v. *Commissioner, supra* at 266; *S.E.C. Corporation* v. *United States, supra* at 719, affirmed 241 F. 2d 416 (C.A. 2), certiorari denied 354 U.S. 909.

Turning to the sales in dispute, we find that *after* the entry of the antitrust decree petitioner "held" the closing machines with a dual purpose: it intended either to lease them or to sell them in the course of its business. We are satisfied on the record that each of

---

[1] No separate argument is made in respect of clause (A) relating to property that would properly be included in the taxpayer's inventory, and we therefore do not consider its applicability here.

these purposes was substantial. Petitioner's sales of closing machines were impressive in each year after the judgment, reaching a peak in excess of 3,800 machines sold in 1953, the year before us, and resulting in profits in excess of $5,800,000. Cf. *William E. Starke*, 35 T.C. 18, 28; *Greene-Haldeman*, 31 T.C. 1286, 1293, affirmed 282 F. 2d 884, 888 (C.A. 9) ; *Albert Winnick*, 21 T.C. 1029, 1038, affirmed per curiam 223 F. 2d 266 (C.A. 6). Petitioner manufactured new machines for both lease and sale and, in fact, sold some of them in the taxable year.[2] Petitioner, in 1950 after entry of the decree, made known the fact that its closing machines would be subject to sale, not only by sending appropriate notices to its lessees[3] but also by announcing the fact that they were subject to sale in trade journal advertisements. See *S.E.C. Corporation* v. *United States, supra; King* v. *Commissioner*, 189 F. 2d 122 (C.A. 5), affirming a Memorandum Opinion of this Court, certiorari denied 342 U.S. 829. Petitioner's closing machine activities were such that, with the start of the closing machine sales, it established a separate department to handle this phase of its business and conducted schools to train its customers' employees in the use of the machines. Our conclusion that petitioner had a substantial purpose to sell its closing equipment in the ordinary course of its business requires the gains to be treated as ordinary income.

Of course the situation would have been different had the Government been successful in obtaining a decree of divestiture. In such circumstances, petitioner would merely have been liquidating its closing machines not theretofore held for sale, and it could therefore be cogently urged that such forced liquidation would not represent sales made in the ordinary course of business. But petitioner strenuously and successfully resisted a decree of divestiture. Instead, it sought and obtained a milder decree, which, it contended, would give adequate protection against future antitrust violations. That milder decree changed the nature of its closing equipment operations. No longer was it holding the machines for lease alone. It now set up a separate closing equipment department, which manufactured new units and which held itself out to lease or sell *all* units, both those on hand as well as the new ones. The decree worked a change in

---

[2] Thus, included in the 1953 sales here in controversy were 188 sales of machines manufactured by petitioner after January 1, 1951, at an aggregate profit of $299,658.14 ; in addition, petitioner in 1953 made sales of 45 more machines (which it had manufactured in whole or in part in 1953) for $764,432.24, and it reported the profits from such sales as ordinary income.

[3] The first set of notices included a copy of the decree as well as a 10-page "Prefatory Statement" which attempted to summarize "in layman's language" the effects of the judgment. In this statement petitioner revealed its understanding of the intent and effect of the judgment on its dealings with closing machines, as follows : "Essentially, the * * * judgment calls for separate handling, beginning next January [1951], of our business of making and selling containers *from our business of manufacturing and selling or leasing closing machines and equipment."* ·(Emphasis supplied.)

petitioner's business. Beginning with January 1, 1951, petitioner was put into the business of leasing *and selling* closing equipment. The resulting sales were not made in any process of liquidation, forced or otherwise. They were sales in the regular course of the newly established business. To be sure, the establishment of this business was undoubtedly distasteful to petitioner, but it deliberately undertook the venture because it was less drastic than complete divestiture, that might otherwise have been required as a consequence of its violation of the antitrust laws. The fact is that it did commence an integrated closing equipment business in 1951 and that the units sold by it in 1953, the third year thereafter, were "held" by it in that business for sale or lease in the ordinary course of that business. In these circumstances, the profits on sale are not entitled to preferential treatment as capital gains. Compare *Ehrman* v. *Commissioner*, 120 F. 2d 607, 610 (C.A. 9), affirming 41 B.T.A. 652, certiorari denied 314 U.S. 668:

> Taxpayers suggest * * * that they should not be held to have been in the trade or business * * * because * * * they were forced into the position by reason of the condition of the property when it was reacquired by them * * *. They refer to the property as having been acquired by them in a "damaged" state. *We fail to see that the reasons behind a person's entering into a business * * * should be determinative of the question of whether or not the gains resulting from sales are ordinary or capital gains.* The sole question is—were the taxpayers in the business * * *? [Emphasis supplied.]

Cf. also *C. E. Mauldin*, 16 T.C. 698, 710–711, affirmed 195 F. 2d 714 (C.A. 10); *Louisiana Western Lumber Co.*, 22 T.C. 954, 958–959.

It may be said that the decree put petitioner in the closing machine business just as inheritance, *Gilford* v. *Commissioner*, 201 F. 2d 735 (C.A. 2), affirming a Memorandum Opinion of this Court; *Anders I. Lagreide*, 23 T.C. 508, 511–512; gift, *Rosalie W. Post*, 26 T.C. 1055; change of business conditions, *C. E. Mauldin, supra; Charles E. Reithmeyer*, 26 T.C. 804, 812–813; or other circumstances, *Ehrman* v. *Commissioner, supra*, have impelled other taxpayers to engage in a business. The significance of petitioner's conduct cannot thereby be overcome.

2. *Accrual issue.*—Although petitioner kept its books and reported its income on an accrual system of accounting, it inconsistently deducted vacation pay and property taxes of four States (New Jersey, Maryland, Louisiana, and California)[4] on the cash basis, namely, in the year when it made the payments in question rather than in the year when the liabilities therefor accrued.

---

[4] It correctly deducted the property taxes for all other States in the year that the liabilities accrued rather than in the year of payment, and the deductions for those property taxes are accordingly not in issue.

There is no dispute as to when the liabilities accrued or when they were paid.[5] The question before us is simply whether petitioner is entitled to deduct in 1953 the liabilities which in fact accrued in 1953. We think the clear answer is that it may deduct these amounts in 1953, the year of accrual, in conformity with accrual principles of accounting, notwithstanding that it had uniformly treated such items incorrectly for an undisclosed[6] number of prior years.

In section 41 of the 1939 Code[7] it is provided that "net income shall be computed * * * in accordance with the method of accounting regularly employed in keeping the books" of the taxpayer, unless "the method employed does not clearly reflect the income," in which case "the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income." Section 43 provides that "deductions and credits * * * shall be taken for the taxable year in which 'paid or accrued' or 'paid or incurred', dependent upon the method of accounting upon the basis of which the net income is computed, unless in order to clearly reflect the income the deductions and credits should be taken as of a different period." There is not even the slightest suggestion here that the accrual method of accounting, consistently applied, would not clearly reflect petitioner's income. The statute thus required petitioner, which kept its books on an accrual system, to report its income on the accrual system and to take its deductions and credits in accordance with accrual accounting.

The decisions recognizing that it is not open to an accrual basis taxpayer to treat selected items on a cash basis are almost too numer-

---

[5] Thus, as to the property taxes for the four States, it is stipulated that liability in the amount of $1,659,773.59 "accrued in 1953" but was paid in 1954. As to vacation pay, it is stipulated that $6,522,584.34 "accrued in 1953." In addition, $366,581 of increased vacation pay was attributable to the period December 2–December 31, 1953, pursuant to a contract dated January 12, 1954, between petitioner and the United Steelworkers of America, CIO, which was made retroactive to December 2, 1953. Whether this amount of $366,581 also accrued in 1953 appears to have been in contest between the parties at one time. However, petitioner's opening brief relied upon *Fawcus Machine Co.* v. *United States*, 282 U.S. 375, to establish that the liability accrued in 1953. The Government's brief neither attempts to distinguish the *Fawcus* case, nor does it even discuss the question at all. In the circumstances, we assume that the accruability of the $366,581 added vacation pay in 1953 is no longer in contest, and we do not pass upon it.

[6] As to vacation pay, the stipulation discloses merely that for "several years prior to 1953," petitioner had in force vacation plans similar to those in force during 1953, and that petitioner deducted the vacation pay expense in the years when payments were made rather than when liabilities therefor accrued "For all of the years prior to 1954 during which its vacation plans were in effect." As to property taxes, petitioner's practice with respect to its liability for taxes owed to New Jersey, Maryland, Louisiana, and California was inconsistent with its practice as to the property taxes owed to all other States. However, it is stipulated that "For all of the years prior to 1954 during which it paid property taxes" it deducted the property taxes payable to those four States in the years of payment rather than in the years of accrual.

[7] Since the taxable year in controversy is 1953, only the 1939 Code is here involved. It is noteworthy that the corresponding sections of the 1954 Code specifically set forth permissible methods of accounting, including for the first time so-called hybrid methods in addition to the cash receipts and disbursements method, accrual method, and "any other method permitted by this chapter." Sec. 446(c), I.R.C. 1954.

ous for useful cataloging. It will suffice to refer to but several of them. In *United States* v. *Anderson*, 269 U.S. 422, it was held that an accrual basis taxpayer could not determine its true income without deducting all items of expense in the year in which such items accrued. *Anderson* specifically decided that a munitions tax which accrued in 1916 and was paid in 1917 must be deducted by an accrual basis taxpayer in 1916. The Court said (269 U.S. at 440) :

> The appellee's true income for the year 1916 could not have been determined without deducting from its gross income for the year the total cost and expenses attributable to the production of that income during the year. * * *

Since *Anderson* it has been the rule "that a taxpayer who accounts on the accrual basis may, and should, deduct from gross income a liability which really accrues in the taxable year." *Dixie Pine Products Co.* v. *Commissioner*, 320 U.S. 516, 519; cf. *Security Flour Mills Co.* v. *Commissioner*, 321 U.S. 284; *United States* v. *Olympic Radio & Television*, 349 U.S. 232; *Heer-Andres Investment Co.*, 17 T.C. 786. Only recently the Supreme Court in *United States* v. *Consolidated Edison Co.*, 366 U.S. 380, 385, restated this principle in the negative as follows: "[N]either the Government nor an accrual-basis taxpayer may cause an item to be deducted in a year other than the one in which it accrued [citing *Anderson, Security Flour Mills*, and *Olympic Radio & Television*]."

Applying this rule to the present case, it is apparent that petitioner's practice of deducting the disputed vacation pay and property taxes of a few States in the years in which the liabilities were paid rather than in the years in which they accrued was erroneous because it was inconsistent with its overall accrual method of accounting. At least since the *Anderson* case, as an accrual basis taxpayer, petitioner was required to deduct these expenses (as it was all its expenses) in the year in which they were properly accruable. It seeks to accomplish this in the instant case. Given the respondent's admission that the disputed expenses accrued in 1953 in the amounts claimed by petitioner, we think the deductions must be allowed.

As previously noted, respondent does not argue that the proper accrual and deduction of the vacation pay and State property tax expenses in issue will not, in the words of the statute, "clearly reflect the income" of petitioner. Instead, he would have us decide, regardless of the propriety of these deductions, that the revision of the treatment of these items for tax purposes constitutes a change in petitioner's method of accounting which under the applicable regulations may not be accomplished without securing the consent of the Commissioner. Regs. 118, sec. 39.41–2(c) ; cf. *Wright Contracting Co.*, 36 T.C. 620; *Commissioner* v. *O. Liquidating Corporation*, 292 F. 2d 225 (C.A. 3), reversing a Memorandum Opinion of this Court, certiorari denied

368 U.S. 898; *Advertisers Exchange, Inc.*, 25 T.C. 1091, affirmed per curiam 240 F. 2d 958 (C.A. 2). Since it has been stipulated that no request was made for the Commissioner's consent to the changes here in issue, respondent asks that the revised deductions be disallowed. However, we think respondent confuses the issue by attempting to characterize the disputed revisions as a change in method of accounting.

The correction of the erroneous treatment of these two items does not involve a change in accounting systems. Petitioner was on an accrual basis and the adjustments which it seeks would in no sense constitute a departure from accrual accounting; rather they would merely make these items conform to its system of accrual accounting. In a case involving this very taxpayer, where the shoe was on the other foot (since it was the Commissioner who insisted upon a change in treatment of a particular item), the Court of Appeals for the Second Circuit stated (*American Can Co.* v. *Bowers*, 35 F. 2d 832, 835, certiorari denied 281 U.S. 736):

> Here the Commissioner made no change as to the accrual system of accounting. * * * he did not change the method of bookkeeping; his act was not an inconsistent treatment of any item on the returns; it was merely a correction of an item incorrectly stated on the same accrual basis. * * *

And, in another case, also involving this taxpayer, the Supreme Court, referring to the term "basis of keeping accounts" in the Revenue Act of 1916, which obviously meant the same as "method of accounting," stated (*United States* v. *American Can Co.*, 280 U.S. 412, 419–420):

> "Basis of keeping accounts" as there used refers to the general bookkeeping system followed by the taxpayer and not to the accuracy or propriety of mere individual items or entries upon the books. And to correct an improper item in a return—whether the result of mere error or designed—cannot properly be said to constitute rejection of the basis upon which the return was constructed. * * * Here the taxpayers kept their accounts on the accrual basis and elected to make their returns accordingly. They cannot complain because an item therein was changed so as to conform with admitted facts. * * *

The contrary view would in effect sanction hybrid accounting practices and would treat as a "system of accounting" a mixture of accrual and cash items. It seems all too clear that, regardless of the law under the 1954 Code,[8] no such hybrid systems are permissible under the 1939 Code or prior revenue laws. In addition to the cases noted above, see *Niles Bement Pond Co.* v. *United States*, 281 U.S. 357, where the Court said (p. 360):

> Under the 1916 act, where the taxpayer's books are kept and his returns made on the accrual basis, taxes charged on the books as they accrue must be deducted when accrued, if true income is thus reflected. United States v. Ander-

---

[8] See footnote 7, *supra*.

son, 269 U.S. 422, 46 S. Ct. 131, 70 L. Ed. 347. Even if not so charged, it was competent for the Commissioner, under the Act of 1916, as well as under the express provisions of section 212(b) of the Act of 1918, to correct the taxpayer's return by deducting payments in the year in which they accrued so as to reflect true income *by conforming to the dominating or controlling character of the taxpayer's system of accounts.* United States v. American Can Co., 280 U.S. 412, 50 S. Ct. 177, 74 L. Ed. 518, decided February 24, 1930. See United States v. Mitchell, 271 U.S. 9, 12, 13, 46 S. Ct. 418, 70 L. Ed. 799. [Emphasis supplied.]

Cf. *Aluminum Castings Co.* v. *Routzahn*, 282 U.S. 92. And see *Massachusetts Mutual Life Ins. Co.* v. *United States*, 288 U.S. 269, where the Supreme Court said (pp. 273–274):

The regulations of the Treasury under all the Revenue Acts since 1916 have required taxpayers to report on the cash or accrual basis, depending on which method was pursued in their accounting. Since the adoption of the Revenue Act of 1921 the requirement has been statutory. It is settled beyond cavil that taxpayers other than insurance companies may not accrue receipts and treat expenditures on a cash basis, or vice versa. *Nor may they accrue a portion of income and deal with the remainder on a cash basis, nor take deductions partly on one and partly on the other basis.* [Emphasis supplied.]

The thoughts thus expressed have been frequently reiterated by the lower courts in numerous cases. We mention but a few of them. See *Hygienic Products Co.* v. *Commissioner*, 111 F. 2d 330 (C.A. 6), certiorari denied 311 U.S. 665, where the Court of Appeals said (p. 331):

Petitioner characterizes its system of accounting as "hybrid". No such system, however, is recognized by the Act; unless the system conforms to the one method, it does not reflect income in accordance with the Act, and the Commissioner is empowered to make such corrections as are necessary to make the return accurately reflect income.

And this Court in *Estate of Julius I. Byrne*, 16 T.C. 1234, pointed out at length that a taxpayer may not determine its income on a hybrid system of accounting and must conform either to the cash or accrual method, whichever its system of accounting most closely resembles (p. 1246):

The general rule is that net income shall be computed in accordance with the method of accounting regularly employed in keeping the books of the taxpayer, but if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does reflect the income. Section 41. Two methods of accounting are generally recognized for income tax purposes. One is the cash receipts and disbursements method under which items are deducted only when paid. The other is an accrual method under which obligations must be accrued and deducted when they are incurred. Section 43. Both parties agree that B.D. used a hybrid method which involved inconsistency. If that method was more like a cash method than it was an accrual method, then adjustments would be in order to make it conform completely to a cash method, but if it was more like an accrual method, then the adjustments made by the Commissioner must stand. *Bartles-Scott Oil Co.*, 2 B.T.A. 16; *Maine Dairy Co.*, 4 B.T.A. 375; *John*

*F. Cook*, 4 B.T.A. 916; *Coatesville Boiler Works*, 9 B.T.A. 1242; *Schram* v. *United States*, 118 F. 2d 541; *Hygienic Products Co.*, 37 B.T.A. 202, affd., 111 F. 2d 330. The petitioner has failed to show that the method which it used more nearly resembled a cash method than an accrual method. The evidence shows that it more nearly paralleled an accrual method. The Commissioner did not err in disallowing deductions for taxes paid, in allowing deductions for taxes which were incurred and should have been accrued, and in accruing other nondeductible taxes for the purpose of computing the excess profits credit based upon invested capital. * * *

It is plain on the record before us that petitioner is not here attempting to change from a hybrid system or from an accrual system to something else. On the contrary, by seeking to deduct the vacation pay and State property tax expenses in the taxable year in which they accrued, petitioner is attempting to perfect its accrual method of accounting, to eliminate the errors which have existed therein. The fact that these errors had gone uncorrected during prior years does not make them less erroneous in the taxable year under consideration nor does it make the need for their correction less immediate. Cf. *Booth Newspapers, Inc.*, 17 T.C. 294, 297, affirmed 201 F. 2d 55 (C.A. 6); *Heer-Andres Investment Co.*, 17 T.C. 786. In the *Heer-Andres* case we took note of a contention based upon the so-called consistency of the taxpayer's practice in prior years, saying (17 T.C. at 788):

Nor is a different result required by the fact that in the four or five years prior to the years involved herein petitioner had similarly reported the additional rent in its returns for the year subsequent to the year with respect to which such additional rent had accrued. If its returns were incorrect for the first year of the lease, the error is not vitiated by being repeated in three or four successive returns. Compare *Booth Newspapers, Inc.*, 17 T.C. 294, where a particular item had been erroneously treated on the taxpayer's books and returns for a period of 15 years prior to the tax years in litigation.

Neither estoppel nor any other principle of law is operative to prevent petitioner's 1953 taxes from being correctly computed under the statute.

It has been clear, at least as far back as the *Anderson* case, that corrections of individual items to conform to the taxpayer's basic system of accounting are not discretionary either for the taxpayer or the Commissioner. See *Security Flour Mills Co.* v. *Commissioner*, 321 U.S. 284, where the Supreme Court said (pp. 285–287):

the well understood and consistently applied doctrine [is] that cash receipts or matured accounts due on the one hand, and cash payments or accrued definite obligations on the other, should not be taken out of the annual accounting system and, for the benefit of the Government or the taxpayer, treated on the basis which is neither a cash basis nor an accrual basis, because so to do would, in a given instance, work a supposedly more equitable result to the Government or to the taxpayer. * * * *The uniform result has been denial both to government, and to taxpayer of the privilege of allocating income or outgo to a year other than the year of actual receipt or payment, or, applying the accrual basis, the*

*year in which the right to receive, or the obligation to pay, has become final and definite in amount. \* \* \** [9]—[Emphasis supplied.]

Similarly here, the corrections under consideration are necessary for the determination of petitioner's true income under an accrual method of accounting, and it is a matter of no moment whether such corrections are sought by the Government or the taxpayer.

Finally, it should be noted that allowing petitioner the claimed accrued expenses in 1953 will not result in any double deductions for the vacation pay and State property tax items involved. The parties have stipulated that if petitioner should be allowed the deductions claimed, the expenses erroneously claimed on its 1953 return (which petitioner paid in 1953 but accrued in 1952) should not be allowed. We concur that this is appropriate and consistent with the views expressed herein; as an accrual basis taxpayer, petitioner is entitled to deduct only the expenses which are properly accruable in 1953.

3. *Finance company reserve.*—The final issue is whether petitioner erroneously computed its income by including in its receipts the entire face amount of notes received by it on installment sales, where petitioner had endorsed such notes without recourse to a finance company which had purchased the notes from petitioner and which had retained a portion of the face amount of the notes as a reserve to be released thereafter to petitioner in accordance with contingencies based upon the finance company's experience in collecting the amounts due on the notes. Petitioner concedes that the precise question was disposed of in *General Gas Corporation,* 33 T.C. 303, where it was held, in reliance upon *Commissioner* v. *Hansen,* 360 U.S. 446, that the entire face amount of similar notes was to be taken into account in computing the income of the taxpayer whether or not it became personally liable for payment of the notes upon the assignment. Petitioner insists, however, that *General Gas Corporation* was incorrectly decided. The decision in that case has recently been affirmed by the Court of Appeals for the Fifth Circuit, 293 F. 2d 35. We have reexamined the question and find no reason to reach a different result.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

PIERCE, *J.,* dissents as to the first issue.

———

OPPER, *J.,* dissenting: The deceptively simple treatment of the second issue compels the expression of some thoughts in disagreement. Even a superficial examination of the authorities said to support that

---

⁹ Although there is language in *Brown* v. *Helvering,* 291 U.S. 134, that may give some color of support to the Government's position here, that case must be read in the light of the later decision in *Security Flour Mills Co.* v. *Commissioner,* 321 U.S. 284, where the Supreme Court referred to *Brown* as well as a number of other cases in support of its conclusions. In the circumstances, the *Brown* case can hardly be regarded as authority for a contrary result.

conclusion makes apparent that not one justifies it. On the contrary, even if the novel result now being reached were a desirable one, it would be necessary to overrule other authorities not cited, or apparently misconstrued and ignored. But I must say I am at a loss to see why it would be beneficial either for taxpayers or the revenue to try to reach it.

## I.

The cases cited in support of the opinion are, without exception, instances where respondent has taken the initiative in disapproving or attempting to change some part of a taxpayer's accounting system. As Judge Kalodner aptly says in *Commissioner* v. *O. Liquidating Corporation*, 292 F. 2d 225, 230 (C.A. 3, 1961), certiorari denied 368 U.S. 898 (1961):

> The rule stated is not applicable here for the simple reason that the Commissioner did not attempt to change taxpayer's method of accounting and impose adjustments, but, on the contrary, he sought only to prevent a change in the taxpayer's method of accounting for this item to which he had not first given his consent and to require adherence to the method used for many years prior to 1953. * * *
>
> On review of the record we agree with the Commissioner's contention that while taxpayer did not change its over-all method of accounting it did change its treatment of a significant item—the insurance dividends which amounted to $114,000—and that its action constituted a change in the method of accounting within the meaning of the Treasury Regulations. The Tax Court, in our opinion, erred in finding to the contrary.

The true rule is that laid down in *Brown* v. *Helvering*, 291 U.S. 193 (1934):

> Moreover, the method employed by the taxpayer is never conclusive. If in the opinion of the Commissioner it does not clearly reflect the income, "the computation shall be made upon such basis and in such manner" as will, in his opinion, do so. * * * In assessing the deficiencies, the Commissioner required in effect that the taxpayer continue to follow the method of accounting which had been in use prior to the change made in 1923. To so require was within his administrative discretion.
>
> *       *       *       *       *       *       *
>
> The Commissioner was of opinion that the method of accounting consistently applied prior to 1923 accurately reflected the income. He was vested with a wide discretion in deciding whether to permit or to forbid a change. * * * It is not the province of the court to weigh and determine the relative merits of systems of accounting. * * *

See also *United States* v. *Ekberg*, 291 F. 2d 913, 925 (C.A. 8, 1961).

## II.

But even where respondent has taken the initiative, he has not always been successful. The opinion appears to assume that had he required here the change now approved of, he would necessarily

be sustained. That that is extremely doubtful seems to me to follow from such precedents as *Pacific Grape Prod. Co.* v. *Commissioner*, 219 F. 2d 862 (C.A. 9, 1955); and also *Atlantic Coast Line Railroad Co.*, 4 T.C. 140, 150 (1944), where respondent's effort to require a taxpayer to deduct the entire amount of capital stock tax in the year in which it became due was unsuccessful, although we said (p. 151):

True, there was a technical liability on July 1 of each year for the entire tax. True, an estimate could be, and was in fact, made in advance as to its amount. * * *

### III.

For us to reach the present result we must not only apply rigid legal rules to accounting problems—about which, as lawyers, we know little—which require flexibility and sound but not doctrinaire techniques, but we must disregard the respondent's regulation which was obviously designed to permit precisely what we are saying here is forbidden:

It is recognized, however, that particularly in a going business of any magnitude there are certain overlapping items both of income and deduction, and so long as these overlapping items do not materially distort the income they may be included in the year in which the taxpayer, pursuant to a consistent policy, takes them into his accounts. [Regs. 118, sec. 39.43-2.]

It would seem that such items as vacation pay and State property taxes, both real and personal, are peculiarly included in such "overlapping items." When an employee's vacation benefits are earned partly in an earlier year and partly in another, but he does not become eligible to take his vacation until the later year, it is impossible to decree categorically that they are more appropriately charged against the earlier year's income. See Blough, Practical Applications of Accounting Standards (American Institute of Certified Public Accountants 1957), p. 164.

Similarly, as to State property taxes, for example, in *Commissioner* v. *Schock, Gusmer & Co.*, 137 F. 2d 750 (C.A. 3, 1943), relied upon in *Atlantic Coast Line Railroad Co.*, *supra*, the court said (p. 754):

both of the New Jersey taxes under consideration would in the normal course be treated as part of overhead expense, and, as part of such overhead expense, not for the year *in* which they were assessed but for the year *for* which they were assessed.

### IV.

In addition to *Commissioner* v. *O. Liquidating Corporation*, *supra*, a number of other authorities, one as late as last June, are directly contrary to the present conclusion. It is difficult to believe they are being overruled, but they are certainly not distinguishable. In *Advertisers Exchange, Inc.*, 25 T.C. 1086, 1092 (1956), affirmed per curiam 240 F. 2d 958 (C.A. 2, 1957), we said:

Consistency is the key and is required regardless of the method or system of accounting used. * * *

As heretofore noted, the effect of respondent's determination is to require the continued use of the accounting method consistently employed by petitioner for a number of years. To do so is within the broad administrative discretion accorded respondent under the statute and is not to be disturbed unless an abuse of such discretion is evident. * * *

Nor may petitioner's action in effecting the change in the manner of treating items of income and expense be denominated as merely a technical correction of prior errors, although its intention was to align more closely its income from contract sales with the expenses incurred in servicing the contracts. This was a substantial change which may have had some adverse effect upon the revenues, thus clearly requiring the Commissioner's prior consent to the change. * * *

And in *Wright Contracting Co.*, 36 T.C. 620 (1961) (Court reviewed, without dissent), which cites *Commissioner* v. *O. Liquidating Corporation, supra,* we said:

net income shall be computed upon the basis of the taxpayer's annual accounting period "in accordance with the method of accounting regularly employed in keeping the books of such taxpayer" but if that method does not clearly reflect the income then "the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income." Section 42 provides that all items of gross income shall be included in income under the method of accounting permitted under section 41. The statute invests the Commissioner with broad administrative discretion to determine the question of the method of accounting which does clearly reflect the income, and the well-established rule is that the courts may not overturn the Commissioner's determination of that question unless the evidence clearly shows an abuse of his discretion. * * *

Section 39.41–2(c) of Regulations 118, the pertinent portions of which are set out in the margin,[2] requires that a taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner. * * * The cited regulation has the purpose of requiring consistency in the method of accounting for tax purposes and the courts have long approved the respondent's refusal to permit a change in a taxpayer's consistently used method of accounting without his prior consent.

The question here is not whether the change would be proper. We may grant the propriety of the change (necessarily requiring considerable adjustments not made by the petitioner).[4] However, this question, in our opinion, would only be pertinent for our consideration here if it were raised before us *after* a request by petitioner for such change had been refused by the Commissioner. [Footnotes omitted.]

Other precedents supporting the same view are too numerous to list. In *Michael Drazen,* 34 T.C. 1070, 1076 (1960), their mere citation covers almost a half page. This position is so clearly in accord with the familiar principle that a litigant with the Government must first exhaust his administrative remedies, see e.g., *Pioneer Parachute Co.,* 4 T.C. 27 (1944), that it is difficult to see why the distinction from the cases relied on, where respondent has already taken his final action, is not being recognized here.

## V.

The year before us is 1953. In that year the manner in which the petitioner kept its books, and, in fact, in which it reported its income, was that which we now say it may unilaterally and retroactively change. There is no adequate proof that the procedure consistently employed in the past did not reflect petitioner's income with sufficient accuracy. And yet it is succeeding in changing its accounting and its reporting without respondent's consent and diametrically contrary to his determination. This is nowhere permitted by any statutory provision to which reference is made. And it is not accurate to say that the result will not be detrimental to the revenue. If the change is now permitted, as the stipulation is worded there may be some accounting period, either 1952 or 1953, in which petitioner will obtain the benefit of a double deduction.

## VI.

The only possible justification for arriving at a disposition of this matter, which is itself undesirable, supported by no relevant authority, and opposed by precedents of persuasive force, is the improvident language of the stipulation. But I cannot believe that respondent intended to stipulate himself out of court, and, in any event, what he agreed to must have been exclusively factual, not legal.

Parties may not stipulate a conclusion of law which it is the province of the Board to decide. *Ohio Clover Leaf Dairy Co.*, 8 B.T.A. 1249; 9 B.T.A. 433; affd. 34 Fed. (2d) 1022; certiorari denied, 280 U.S. 588. [*First National Bank of Boston, Administrator*, 25 B.T.A. 252, 257 (1932).]

For the stipulation to mean what it is now interpreted to say would require a complete disregard by respondent of his own regulation and make a mockery of bringing such a case as this for decision in this forum.

I would sustain respondent on all three issues.

TIETJENS and FAY, *JJ.*, agree with this dissent.

---

ATKINS, *J.*, dissenting: In general I am in accord with the dissent filed by Judge Opper, but I think it sufficient to state that although the general rule is that individual or specific items of income or deductions must be treated in conformity with the basic method of accounting employed by the taxpayer and that correction of errors with respect thereto must be made whether urged by either the taxpayer or the respondent, the rule is different where, as here, the taxpayer has maintained for a number of years a practice of treating differently a class or type of expense which is recurring and substantial. In such a case the method of treatment constitutes a method of accounting

regularly employed by the petitioner with respect to such type of deduction and a change of such method may not be allowed without prior application for approval by the respondent. In my opinion such conclusion is required by *Brown* v. *Helvering*, 291 U.S. 193; *Wright Contracting Co.*, 36 T.C. 620; and *Commissioner* v. *O. Liquidating Corporation*, (C.A. 3) 292 F. 2d 225, certiorari denied 368 U.S. 898, relied upon in our *Wright Contracting Co.* case.