Sanford D. Adler (Transferee of Assets of S. D. Adler Builders, Inc.) v. Commissioner. Sanford D. Adler (Transferee of Assets of Dream Homes, Inc. v. Commissioner.
Adler v. Commissioner
Docket Nos. 32802, 32803.
United States Tax Court
1953 Tax Ct. Memo LEXIS 179; 12 T.C.M. (CCH) 804; T.C.M. (RIA) 53245; July 8, 1953
*179 Milford S. Zimmerman, Esq., 745 Title Insurance Bldg., Los Angeles, Calif., and Brian J. Kennedy, Esq., for the petitioners. William P. Flynn, Jr., Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion These proceedings arise from the determination of the Commissioner that the petitioner is liable, as transferee, for the following deficiencies in income tax: Docket No.
Transferor Taxpayer
Year
Amount
32802
S. D. Adler Builders, Inc.
1946
$20,923.19
32803
Dream Homes, Incorporated
1946
3,495.34 The petitioner does not contest his liability as transferee if the determination of the deficiencies against the transferor taxpayers is correct. An adjustment in Docket Number 32802 arising from the disallowance of a deduction for bad debts is not contested by the petitioner. The sole question presented for our determination is whether the gain received from the sale of certain houses, owned by the transferor taxpayers, is taxable as ordinary income or capital gain. Findings of Fact The petitioner is an individual with his residence in Reno, Nevada. His income tax return for the taxable year 1946 was filed with the collector *180 of internal revenue for the district of Nevada. The corporation income tax returns, for the taxable year 1946, of S. D. Adler Builders, Inc. and Dream Homes, Incorporated were filed with the collector of internal revenue for the district of Michigan. S. D. Adler Builders, Inc. (hereinafter referred to as "Builders") and Dream Homes, Incorporated (hereinafter referred to as "Dream Homes") were Michigan corporations organized in the years 1940 and 1942, respectively. At the time of incorporation, the charter of Dream Homes provided for a corporate life of thirty years; Builders' charter provided for corporate existence extending beyond December 31, 1946. Both charters were amended during 1946 to shorten the lives of the corporations and to provide for their liquidation and dissolution on December 31, 1946, and the corporations were liquidated on that date. The petitioner for a number of years prior to 1942 had been engaged, in Detroit, Michigan, in the business of building houses for sale purposes. He had carried on such business as an individual, through a partnership and through corporations. Except for so-called "qualifying shares", he was the sole stockholder of Builders and Dream *181 Homes, and those corporations were organized by him for the purpose of carrying on the business of building houses. He also owned interests in other corporations engaging in the same type of business. The construction of houses by Builders took place in the Detroit area in the years 1940 through 1944, inclusive, and by Dream Homes in the year 1943. Prior to 1942, the petitioner had never constructed any houses with the intention of holding them for rental. At the time of the incorporation of Builders, it was intended that all houses constructed by it would be offered for sale. With the advent of the housing shortage caused by the war emergency, in 1942 and 1943 the United States Government placed certain restrictions on building houses. Priorities for construction materials could not be obtained unless a certain percentage of the houses to be built were offered for rental under Government controls. Builders obtained the necessary priorities for materials and constructed 57 houses which were required to be rented. In 1943, Dream Homes also built twelve houses which under the same Government restrictions were "rental" homes. Builders also rented nine houses, which it was permitted *182 to sell under Government regulations. The sale of houses was also subject to price ceilings imposed by the Government, and very little gain could have been realized on the sale of those nine houses because of such ceilings. A substantial number of other houses were constructed in 1942, 1943, and 1944 by Builders and Dream Homes and were sold in the years prior to 1945. These were houses held primarily for sale to customers in the ordinary course of the trade or business of the corporations. The gain received on the sale of such houses was reported by the corporations as ordinary income The 78 houses, above referred to, [1] were being rented by the corporations under lease agreements providing for tenancies from month to month. Among other provisions, the lease agreements provided for the right of the lessor to enter the houses for the purpose of showing the houses to prospective purchases. There were no written or oral agreements or understandings with the tenants relating to the purchase of the house when the restrictions were removed. When the houses were sold in 1946, only a few of them were sold to tenants. Accounts for the rental income from the houses were kept by an employee hired by the corporations. Additional accounts for amounts due from the sale of houses by the corporations were also kept by that employee. When vacancies occurred a maintenance man cleaned the house and placed a "for rent" sign on the premises.
In 1945, the petitioner moved from Detroit to California. The corporations had ceased their building activities and the petitioner withdrew money from them by borrowing. The petitioner entered into the hotel business in California and Nevada. On October 15, 1945, the Government revoked the restrictions on the sale of houses which in prior years *183 were required to be rented. Builders at that time owned 57 of such "rental houses", nine other houses and thirteen unimproved lots. Dream Homes owned twelve "rental houses" and five unimproved lots. None of those properties was sold in 1945. During 1946, Builders and Dream Homes sold all of the 78 houses which they then owned. All of the houses had been rented for at least six months prior to their sale. The sales were made during the months of 1946 as follows: Dream
Builders
Homes
January
February
3
1
March
6
April
9
4
May
9
2
June
30
4
July
3
August
6
September
1
October
November
December All of the sales occurred while petitioner was out of the State of Michigan. The houses were not advertised for sale or listed with brokers. The real estate market was active, however, and brokers made offers to petitioner to purchase the houses since they could be sold at lower prices having been constructed when price ceilings on materials were in effect. As a result of most of the sales the corporations received "land contracts" which are a form of security used in the State of Michigan. These land contracts were later sold by petitioner *184 at fifty per cent of their face value. Upon the liquidation of the corporations on December 31, 1946, petitioner received, as part of the assets of the corporations, quitclaim deeds to the eighteen unimproved lots owned by the corporations. Nine of those lots have been sold at various times since that date and the petitioner intends to sell the remaining lots if he is offered a satisfactory price. Neither the petitioner nor the two corporations ever had a real estate broker's license. The 69 houses which were subject to restrictions against sale were constructed in order to obtain priorities for materials necessary in building other houses for immediate sale. They were built with the intention of holding them for rental as long as the restrictions against sale were in effect and, therefore, either to continue to rent or to sell them depending upon which course was more profitable at that time. Adler and his corporations intended to hold the remaining nine houses for rental until price ceiling regulations were removed and, thereafter, to rent or to sell them depending upon which course was then more profitable. All 78 houses sold by the corporations were properties held primarily *185 for sale to customers in the ordinary course of trade or business of the corporations, at least throughout the taxable year, 1946. As a result of the sale of the houses during 1946, Dream Homes realized a gain of $27,251.24 and Builders realized a gain of $149,527.74. Such amounts were reported by the corporations as long-term capital gain. The respondent determined the deficiencies on the basis that the gain was taxable as ordinary income. Opinion RAUM, Judge: The narrow question presented is whether the 78 houses which were sold by Dream Homes and Builders in 1946 were houses that were held primarily for sale to customers in the ordinary course of their trade or business. The effect of Section 117 (j) [2] of the Internal Revenue Code is that if the houses were not so held and were held as "investment" property the gain from their sale can be treated as long term capital gain. That the question is essentially one of fact is clear. Rubino v. Commissioner, 186 F. 2d 304 (C.A. 9); King v. Commissioner, 189 F. 2d 122, 124 (C.A. 5); Mauldin v. Commissioner, 195 F. 2d 714, 716 (C.A. 10). There would be little benefit gained *186 therefore by an extensive analysis of the numerous cases in which this question has been presented to this and other courts. *187 The petitioner's argument that these houses were held as "investment" property by the corporate owners is based chiefly upon his testimony that his intention as the controlling stockholder and active head of the corporations was to hold them as part of an "investment portfolio". As indications of such intention, the petitioner points out that when 69 of the houses were built, they could only have been built with the intention of holding them for rental because of Government restrictions on their sale; that when such restrictions were lifted in 1945, there was no immediate sale of the houses; that the houses were never advertised or offered for sale, all the sales being consummated as a result of offers to purchase; that nine of the houses, the sale of which was not restricted, were held for rental; and that the rental property was segregated on the books of the corporations from their other property which was admittedly held primarily for sale to customers in the ordinary course of business. We are not convinced by petitioner's testimony. Other facts of record point too strongly in the opposite direction. The two corporations were organized primarily to build houses for sale purposes *188 and did sell a substantial number. Petitioner, for a number of years, had been engaged in that business either as an individual, or through partnerships or corporations. Neither petitioner nor the corporations had ever constructed houses for rental prior to the Government restrictions. We are satisfied that the intention of the petitioner and of his corporations was to construct these rental houses so that materials could be obtained for the purpose of building other houses for immediate sale. The conclusion that there was an intention to sell the socalled rental houses at a later date, when restrictions would no longer be in effect, is fortified by the fact, among others, that no long term leases were entered into, but rather tenancies existed only from month to month. At best, from petitioner's point of view, it was the intention of petitioner and his corporations to rent the controlled houses as long as governmental restrictions were in effect and then either to sell or to continue to rent, taking whichever course might be more profitable at that time. [3] This very situation was considered by the Court of Appeals for the Ninth Circuit which plainly indicated that in such circumstances *189 the profit on sale could not be treated as capital gain. See Rollingwood Corp. v. Commissioner, 190 F. 2d 263 at 266: *190 "Suppose the taxpayer in the instant case intended to rent the houses for as long as he was required to do so under existing regulations and then to sell them. Or suppose his intention was to pursue whichever of these activities proved to be the most profitable, that is, if the rental market were good he would continue to rent but if the sales market were high he would sell. In either of these suppositions we think it is fair to say that one of the essential purposes (in acquiring or holding the houses) is the purpose of sale. Under such circumstances, if the taxpayer does dispose of the houses by sale, is it within the legislative purpose to allow him to treat the proceeds of these sales as a capital gain? We think not." (Italics in original.) It is customary to examine the frequency and continuity of the sales to determine whether or not the property was held primarily for sale. Albert Winnick, 17 T.C. 538, 542, remanded for further findings of fact, 199 F. 2d 374 (C.A. 6); Mauldin v. Commissioner, supra, at 716. In so doing we have found that within four months after the restrictions on sale were removed, the corporations began to dispose *191 of the houses and continued to do so until all were sold. Petitioner attempts to rebut the conclusions which can be drawn from that fact by arguing that all sales resulted from unsolicited offers from purchasers. The state of the real estate market in the Detroit area at that time, however, made the corporations' houses attactive to purchasers so that no advertising or solicitation by the corporations was necessary. Nor is petitioner's case strengthened by the rental of the nine houses which were not so-called "rental" houses under the Government restrictions. Petitioner testified that these houses were held for rental because the amount for which they could be sold, because of ceiling prices, would not produce a profit. These houses then were only held for rental until price ceilings were removed. Thereafter, petitioner and his corporations would determine whether it was more profitable to rent or to sell and take action accordingly. Clearly, they were held primarily for sale and not for investment. It is true that in determining that the taxpayer is in two businesses some weight has been given to the fact that separate accounts are kept for rental and sale houses. Cf. Delsing v. United States, 186 F. 2d 59, 61 *192 (C.A. 5). But the "separate" accounts which petitioner contends were maintained by the corporations do not lead us to the conclusion that these properties were held for investment. Accounts of rental properties as well as sale properties were kept in the same account book but on different pages. Although the accounts appear to have been separately kept from the amounts due from land contracts, we are not convinced that enough has been shown to establish that these properties were not held for sale. On the basis of the entire record, we hold that at least throughout the taxable year 1946 the 78 houses sold by the corporations were held by them primarily for sale to customers in the ordinary course of their trade or business. [4] The gain, then, is properly taxable as ordinary income. Since there is no dispute that the petitioner, as transferee, is liable for the deficiencies. *193 Decisions will be entered for the respondent. Footnotes
1. These consisted of the 57 houses owned by Builders and the 12 houses owned by Dream Homes, the sale of which was restricted by Government regulations. The remaining 9 houses were owned by Builders and could be sold only under ceiling price regulations.↩
2. SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(j) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or (C) a copyright, a literary, musical, or artistic composition, or similar property, held by a taxpayer described in subsection (a) (1) (C). Such term also includes timber or coal with respect to which subsection (k) (1) or (2) is applicable and unharvested crops to which paragraph (3) is applicable. Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. Such term does not include poultry.↩
3. That such dual intention existed at the beginning is strongly suggested by petitioner's guarded testimony in this connection: The Court: "* * * In connection with the homes that are the subject of this controversy, namely, the 66 homes of S. D. Adler Builders, Inc., and the 12 homes in Dream Homes, Incorporated, did you have any intention at the time you built them to offer them for sale at such future time when the restrictions might be lifted?" [Mr. Adler]: "That, your Honor, would be a hard question to answer. If you buy stock you don't know but what maybe ten years later you might want to sell it. It all depends on the time. At the time I built them my only intention was to rent the houses for the profit that I could get out of renting them. I was satisfied with that profit. "If in the future properties went down in price, I might be better off just to stay and rent them. If in the future properties enhanced in value, where the profit from selling them might be better than renting them, then the decision would be to sell them. But at the time these houses were built, at the time I made the investment in these houses, they were only for rental purposes." Although petitioner stated that at the time of construction the "only intention was to rent the houses", such intention necessarily existed because of Government controls, and we are satisfied from his testimony as a whole that he had the dual intention described above.↩
4. Victory Housing No. 2 Inc. v. Commissioner, - F. 2d - (C.A. 10, June 12, 1953) involved a taxpayer that had never been engaged in the real estate business and the Court of Appeals thought that on the facts there presented the houses were not held for sale to customers. Whatever view may be taken of the record in that case, the present case is sharply distinguishable.↩