William A. Scheuber and Hildegard Scheuber v. Commissioner.
Scheuber v. Commissioner
Docket No. 2231-63.
United States Tax Court
T.C. Memo 1966-107; 1966 Tax Ct. Memo LEXIS 173; 25 T.C.M. (CCH) 559; T.C.M. (RIA) 66107; May 25, 1966
*173 Held: That petitioners are not collaterally estopped from denying that certain properties were held primarily for sale to customers in the ordinary course of a trade or business when the prior litigation in this Court was concerned with separate transactions involving different properties and tax years. Held, further: That certain properties were held primarily for sale to customers in the ordinary course of a trade or business. Held, further: That certain reinvestments of condemnation proceeds qualified for nonrecognition of gain treatment under section 1033, I.R.C. 1954. Thomas J. Donnelly, Jr., and John A. Hazelwood, for the petitioners. Stanton P. Sornson, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined the following deficiencies in income taxes against the petitioners: 1958
$ 2,713.30
1959
24,427.38
1960
20,074.03
1961
444.38
Due to petitioners' agreement that certain real estate transactions in 1959 resulted in ordinary losses rather than capital losses, a refund of $593.29 is claimed for the year 1959. After concessions by both parties, the following issues remain for decision: (1) Whether the petitioners are collaterally estopped from denying that certain property was held primarily for sale to customers in the ordinary course of a trade or business because of a prior judgment involving the same parties, and, if not, (2) whether certain property was held primarily for sale to customers in the ordinary course of a trade or business; and (3) to what extent condemnation proceeds were reinvested in property which would qualify particular reinvestments for nonrecognition of gain treatment and whether ordinary or capital *175 treatment should be afforded any gains recognized. Findings of Fact Some of the facts have been stipulated and are found accordingly and adopted as our findings. Petitioners are husband and wife and are residents of Milwaukee, Wisconsin. Their joint Federal income tax returns for the years involved were filed with the district director of internal revenue, Milwaukee, Wisconsin. Petitioners (hereinafter sometimes referred to as William and Hildegard) reported gains from the sale of certain parcels of real estate during the years in question as long-term capital gains, but the respondent disallowed capital-gain treatment because the properties were considered to be held primarily for sale to customers in the ordinary course of business. William has been a licensed real estate broker since 1921. He acts as a broker for the Scheuber Realty and Investment Company which is William's sole proprietorship. William advertised frequently in a local newspaper in connection with his real estate business, and he was well known in the Milwaukee area as a dealer in property. Following petitioners' marriage in 1935, William and Hildegard pursued an investment program. William held title to *176 stocks and bonds while Hildegard held title to real estate. All real property, except for petitioners' residence, which was held jointly, was held in Hildegard's name and all income from real estate sales was reported as income of Hildegard. William acted as Hildegard's agent and advisor with respect to her real estate holdings. Hildegard has never engaged personally in the buying and selling of real estate, and William's advice and actions as agent have always been accepted and approved. Some of the real estate purchased on behalf of Hildegard was bought for the purpose of realizing profit upon a relatively immediate sale of the property. It was contemplated that such property would be held no longer than one year. Other real estate was purchased with the intention that it would be held for long-term appreciation in value. In 1955, 1956 and 1957, petitioners reported gains from sales of 31 unimproved parcels of land, a 98-acre tract, and five rental properties. Whether such gains were properly reported as capital gains or represented ordinary income was the subject of litigation before us in William A. Scheuber, Docket No. 79638, T.C. Memo. 1961-43. We held in that *177 case that sales of unimproved parcels were sales of property held primarily for sale to customers in the ordinary course of business but that the sale of a 98-acre tract and five rental properties resulted in capital gains because the properties were held for investment. The parties have stipulated here that: The petitioners herein are the identical parties as were in litigation before the Tax Court of the United States in the matter of Scheuber, William A. and Hildegarde, Docket No. 79638, T.C. Memo. 1961-43, which was decided by the Court on February 21, 1961, and has become final. Also, they have stipulated that the properties involved in the instant controversy were not considered in the prior litigation, but that certain properties therein involved were either adjacent to or in the general nearby vicinity of certain of the properties with which we are herein concerned. Income from reported sales of petitioners' real estate was approximately 37.31 percent of total income in 1958, 12.61 percent in 1959, 4.48 percent in 1960, and 4.98 percent in 1961. These percentages do not include real estate commissions received from activities conducted through Scheuber Realty *178 and Investment Company and interest received on mortgages and land contracts. The number of transactions involving sales and purchases of petitioners' real estate during the years 1958 to 1961, inclusive, and the length of time property was held are as follows: Approximate
Pur-
Years
Sales
Period Held
chases
1958
3
1 yr. -11 mos.
4
3 yrs.- 8 mos.
8 yrs.- 2 mos.
1959
4
2 yrs.- 3 mos.
3
9 yrs.- 4 mos.
0 yrs.- 1 mo.
1 yr. - 8 mos.
1960
2
0 yrs.- 1 mo.
3
0 yrs.- 2 mos.
1961
2
1 yr. -11 mos.
3
4 yrs.-10 mos.
At the end of 1961, Hildegard held title in her name to 18 parcels of real estate including a residence not occupied by them. She also owned 5 parcels of land jointly with other persons. Petitioners are contesting respondent's determination that sales of unimproved real estate known as the Douglas and Hopkins property which occurred in 1958 and 1959 resulted in ordinary income rather than the long-term capital gains reported. Petitioners claim that this parcel of land was held by Hildegard for investment purposes and not primarily for sale to customers in the ordinary course of business. On July 7, 1950, an *179 unimproved tract of real estate located at 6200 North Hopkins Avenue, Milwaukee, Wisconsin, (also known as Douglas and Hopkins) was purchased on behalf of Hildegard for the sum of $12,000. One-half of the property was sold to Standard Oil Company for $17,038.63 on September 3, 1958. The cost basis and selling expenses of this portion totaled $5,275.28, and the gain on the sale was $11,763.35. On November 17, 1959, the other half of the Douglas and Hopkins property was sold to a veterans' organization for the sum of $15,000. The allocable cost basis and expenses of the sale totaled $8,089.11, and the gain on the sale was $6,910.89. The Douglas and Hopkins property was purchased for the purpose of realizing a profit on the resale arising from commercial development of that area of the city. The property was located in an undeveloped section of the city, but it was zoned local business and situated on Hopkins Street which was an artery leading into Milwaukee. It was anticipated that the future development of the area would eventually increase the value of the property. During the period 1950 to 1959, the petitioners never advertised this property for sale. In 1958 William was approached *180 by a broker representing the Standard Oil Company for the purpose of finding a corner lot in the Douglas and Hopkins neighborhood. The resultant offer was considered more than the property was worth by William, and the outcome was a sale of one-half of the Douglas and Hopkins property. The other half of the Douglas and Hopkins property was sold in 1959 to a veterans' organization, but the way in which this sale originated is not clear from the record. In any event, it appears that William was not directly responsible for the initial contact with representatives of the veterans' organization which ultimately led to the sale of the property. Petitioners are also contesting respondent's determination that certain proceeds received from the condemnation of a parcel of unimproved land resulted in increased ordinary income to them in 1959 and 1960. They contend that reinvestment of these proceeds qualifies for nonrecognition of gain treatment and that any gain resulting was capital in nature. This property is the block between 74th and 75th Streets on Capitol Drive in Milwaukee. In 1945 two blocks of vacant real estate located between 74th and 76th Streets on the south side of Capitol *181 Drive in Milwaukee and two adjacent lots known as lots 27 and 28 were purchased for $10,000 by Hildegard under an agreement with Harry Bradshaw. A deed to this property was given by Bradshaw to Hildegard in 1947. The area was commercially undeveloped at the time of the acquisition. William advised Hildegard that this property would provide an annuity during her old age due to an expected long-term appreciation in its value. William was approached in 1950 by representatives of Standard Oil Company and Wisconsin Independent Oil Company ("Wisco") for the purpose of purchasing the block of property on Capitol Drive between 75th and 76th Streets as a site for a gasoline station. The broker representing Wisco employed a title company to check ownerships in the West Capitol Drive area, and this brought about the initial contact between the petitioners and the broker. Both companies began bidding for the property. William finally accepted an offer of $30,000 from Wisco. In his opinion he received far more than the property was worth. William was notified in 1954 that the zoning of lots 27 and 28 was being changed from local business to residential. The change in zoning would decrease the *182 value of the property so William decided to sell the lots before the zoning was changed. The two lots were sold in 1954 after advertising by means of the newspapers and signs placed on the property. In 1952 William had purchased on behalf of Hildegard lots 25 and 26, which were adjacent to lots 27 and 28 just discussed. These were sold in 1955. Four other lots in the immediate area were purchased by Hildegard in 1954 and sold in 1957. All of these lots were involved in the prior Tax Court litigation hereinabove mentioned, and the sale were held to have produced ordinary income. None of these lots however, had been acquired by Hildegard from Harry Bradshaw in the 1945 acquisition hereinabove mentioned. The City of Milwaukee condemned the block of property between 74th and 75th Streets for use as a site for a public library. This is one of the properties involved in the present proceeding. There had been no extensive efforts on the part of petitioners to sell this property prior to the condemnation, but there had been several prospective sale negotiations involving the tract. In one instance, one-half of the subsequently condemned property was to be sold and a down payment was received. *183 The sale was not consummated, however, and the down payment was returned. In the latter part of 1957 or the early part of 1958, William entered into negotiations concerning the construction of a building on the condemned property for lease purposes, but this transaction was not consummated because of the credit standing of the proposed lessee. Petitioners became aware of the condemnation in 1957 after granting a 10-day purchase option to a broker representing an automobile dealership. When the broker inquired about obtaining an occupancy permit, it was learned that the property was wanted for a city library. Negotiations for the City of Milwaukee's acquisition of the block between 74th and 75th Streets on Capitol Drive began in 1957. The city refused to pay the amount offered by the automobile dealership for the property, and William declined to accept a lower offer. The failure of the city officials and William to reach an agreement resulted in service of a notice for condemnation. The City of Milwaukee paid $93,000 to the petitioners on account of the condemnation in 1959. Being unsatisfied with the amount received, the petitioners instituted a civil action which resulted in *184 a jury award of $129,497.25 in 1960 as the total to be paid for the property. Therefore, an additional $36,497.25 was received by Hildegard as a result of the condemnation award in 1960. The expenses of maintaining the civil action were $12,060. The only advertising during Hildegard's ownership of this tract consisted of week-long 2-line ads in a local newspaper inserted on four occasions during the years 1954-1959 describing the condemned property. There was a "for sale" sign on the condemned property which had been placed there prior to petitioners' purchase in 1945 and which petitioners never removed. The following purchases of real estate in the Milwaukee area were made on behalf of Hildegard in anticipation of the condemnation award or out of proceeds attributable to the condemnation: Property Description
Cost
9601-33 W. Silver Spring Drive
$19,000
(Lots 4 through 10)
9720 W. Appleton Avenue
6,500
10144-46 W. Forest Home Avenue
27,500
108th and Cold Spring Road
50,000
Port Washington and Highland Roads
26,000
There is no dispute here between the parties as to any of these reinvestment purchases save as to one lot in the tract described as Lots 4 *185 through 10, at 9601-33 W. Silver Spring Drive, and the property at 10144-46 W. Forest Home. Petitioners have conceded that the investment in the Port Washington and Highland Roads property did not qualify for nonrecognition treatment. Respondent concedes that the six unimproved lots in the West Silver Spring Drive tract qualify as a reinvestment of the condemnation award. Lot 4 in the tract on West Silver Spring Drive was one of a parcel of 7 lots purchased in 1958 as a unit for $19,000 and other property in trade. Six lots were vacant, but the lot which is here involved was improved by a dwelling house in poor condition. The property was zoned for local business and the structure did not contribute to the value of the property. The building was occupied by people who had not paid rent in over a year at the time of the purchase. William did not inspect the house before purchasing the property, and he considered demolishing it after the purchase. It was decided to repair the building, however, after a business associate convinced William that it would pay to put the house in a habitable condition in order to derive some rental income. The expenses of repairing and remodeling were *186 much higher than originally estimated. However, many of them were incurred for permanent improvements to the property such as sewer and water lines and not for repairs to the existing dwelling. The renovated house produced rent of $75 a month, but payments have always been erratic due to financial problems of the tenants. It is not a desirable residential area. The level of rental income has not justified the amount expended on the property. Petitioners did not purchase this lot for the purpose of receiving rental income. The property was purchased as part of a single tract of 7 lots for the appreciation potential attributable to its location in the path of the city's expected development and its zoning for local business. A property located on West Forest Home Avenue was purchased in 1960 for $27,500. This property was zoned local business and was located on a main highway coming into Milwaukee. Two dwelling houses and a barn were situated on the 2.48-acre tract. William did not inspect the structures before purchasing the property as he was interested only in the appreciation potention of the land itself. The buildings were in extremely poor condition and their presence reduced *187 the value of the property because they would have to be removed for business development and there would be no salvage value. The tenants in possession at the time of the purchase failed to pay the rent, and they eventually left, thereby making it necessary to clean and repair the house in an effort to attract new tenants. A succession of problem tenants have occupied the premises and the rental income derived from the property has been insufficient to justify the expenditures for improvements. William's intent in purchasing the Forest Home Avenue property was not to derive rental income from the modest improvements thereon but to realize a profit from the subsequent sale of this business-zoned property whenever it appeared propitious to dispose of it. Ultimate Findings of Facts The Douglas and Hopkins property and the condemned property were being held primarily for sale to customers in the ordinary course of petitioners' real estate business at the time of the sales and the condemnation. Furthermore, the West Silver Spring Drive property and the West Forest Home Avenue property were acquired as part of petitioners' inventory of real properties and were being held primarily *188 for sale to customers in the ordinary course of business immediately following the reinvestments. Opinion The application of the doctrine of collateral estoppel to this case is a threshold issue. The respondent contends that the petitioners are collaterally estopped from litigating a substantive issue in this case because of prior litigation between the same parties in this Court. It was there held that certain unimproved properties sold by petitioners in earlier years were being held for sale to customers in the ordinary course of business. The respondent argues that the facts, issues, and parties now before the Court are identical to those before the Court in the earlier case. It would therefore follow that the prior decision would govern since the petitioners have had their day in court on the issue. We disagree with respondent's position. The specific transactions which disposed of the unimproved lots involved in the first proceeding are not the same transactions which gave rise to the disposition of the properties presently before us. Our opinion in the prior case makes clear that each transaction therein involved, none of which are before us here, was examined separately. *189 We said: * * * Accordingly, in deciding the ultimate issue in the instant case, we must determine as to each transaction whether the disposition was of property held primarily for sale in the ordinary course of business, or of property held as an investment. Accordingly, we by no conceivable stretch of the imagination determined there that as to all future sales in later years these taxpayers could only sell unimproved real property at ordinary income rates as respondent would have us now hold. See also Commissioner v. Sunnen, 333 U.S. 591 (1948), where the Supreme Court, at pages 601 and 602, made the following statement: But if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case. Thus the second proceeding may involve an instrument or transaction identical with, but in a form separable from, the one dealt with in the first proceeding. In that situation, a court is free in the second proceeding to make an independent examination of the legal matters at issue. It may then reach a different result or, if consistency in decision is considered *190 just and desirable, reliance may be placed upon the ordinary rule of stare decisis. Before a party can invoke the collateral estoppel doctrine in these circumstances, the legal matter raised in the second proceeding must involve the same set of events or documents and the same bundle of legal principles that contributed to the rendering of the first judgment. To the same effect in Philco Corporation v. United States, 214 F. Supp. 892, 894 (E.D. Pa. 1963), where the District Court quoted the Sunnen case, supra, and made the following statement: Although the facts in the case before us and those in the former case may be identical, they involve distinct and separate transactions and collateral estoppel is inapplicable. We hold, therefore, that the doctrine of collateral estoppel is inapplicable when separate transactions involving different properties and tax years are the subject of the subsequent litigation. Petitioners should not be precluded from having their arguments relating to the specific set of circumstances involved in this case considered and ruled upon. Because we have found that the petitioners are not estopped from contesting respondent's determination, *191 it must now be decided whether selling the Douglas and Hopkins property produced capital or ordinary gains. Furthermore, it must be determined whether part of the gain realized from the condemnation award qualifies for nonrecognition treatment. Whether the sale of the Douglas and Hopkins property produced capital or ordinary gains depends upon whether or not the property was held primarily for sale to customers in the ordinary course of a trade or business. Section 1221, Internal Revenue Code of 1954. This is a question of fact as we have frequently observed. Here, the fact that all of the real estate is held in Hildegard's name and that she has never engaged personally in the buying and selling of real estate is of little consequence. An owner of land can engage in the real estate business by acting through an agent. In this case, William is not only Hildegard's agent with respect to her land holdings but is also her husband with whom she files a joint return. In a situation where an agent is the principal's spouse and the agent has complete discretion of action regarding the land being held in the name of the spouse, all the relevant activities of the *192 husband and wife should be considered. Thus, in determining whether the properties in question were being held for sale in the ordinary course of business, William's status as a real estate broker and well-known dealer in land in the Milwaukee area, must be taken into account. Furthermore, it is recognized by both parties that particular properties were purchased for Hildegard with the intention to resell as soon as possible. Thus, it is conceded by petitioner that Hildegard held certain real estate primarily for sale in the ordinary course of business.it is well established, however, that a dealer in real estate may nevertheless be an investor with respect to some of his properties. Eline Realty Co., 35 T.C. 1 (1960); Charles E. Meig, 32 T.C. 1314 (1959). In such a situation, the dealer has the burden of showing that the particular properties were being held for investment and not primarily for sale. Petitioners rely on their intent to make a long-term investment, the relatively long holding period, and the lack of advertising and solicitation of sales in connection with the Douglas and Hopkins property as conclusive evidence that this property was *193 held for investment purposes. We recognize that these factors to be considered in petitioners' favor, but we cannot agree that they conclusively establish that as of the time of sale the Douglas and Hopkins properties were held for investment purposes and not principally for sale in the ordinary course of business. It is the principal or primary purpose at the time of sale that is significant. Bauschard v. Commissioner, 279 F. 2d 115 (C.A. 6, 1960), affirming 31 T.C. 910 (1959); Estate of Peter Finder, 37 T.C. 411 (1961). Even if we were to conclude that the property in question was originally acquired by petitioners as an investment, that purpose is necessarily subject to change. The original purpose then is replaced by the subsequent one, if any, and we must determine the purpose of first importance at the time of sale. Bauschard v. Commissioner, supra; Mauldin v. Commissioner, 195 F. 2d 714 (C.A. 10, 1952), affirming 16 T.C. 698 (1951). Based upon an analysis of the entire record, we have concluded that petitioners from the beginning intended to sell the Douglas and Hopkins property whenever William *194 concluded that a satisfactory profit could be realized. This is the usual pattern of business operation followed by those in the real estate business. The fact that profitable sales could have been made at an earlier date is not inconsistent with an intent to hold properties for sale until the time when the dealer believes the resale will produce maximum profits. Thus, an original intention to hold property for a substantial period does not conclusively establish the presence of an investment. Margolis v. Commissioner, 337 F. 2d 1001, 1004 (C.A. 9, 1964), affirming a Memorandum Opinion of this Court. It is also clear that lack of advertising is inconsequential in a situation where the landowner's agent is an active real estate broker and the demand for undeveloped real estate is such that a seller's market exists. William was constantly being approached by prospective purchasers of property and the record reveals that he treated property owned by his wife as part of the general inventory of properties in which he dealt. Petitioners must be classified as real estate dealers. Furthermore, unimproved property which produced no income is involved. These factors are of *195 particular importance. A transaction in which a dealer in land seeks capital gain treatment should be scrutinized more carefully than a transaction not involving the preceding factors. It would seem that a more stringent burden is placed upon the taxpayer to show that capital gain treatment is proper in such a situation. The capital gains provisions create an exception and should be narrowly construed. Commissioner v. P. G. Lake, Inc., 356 U.S. 260 (1958); and Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1955). Petitioners, relying on the recent Supreme Court decision in Malat v. Riddell, 383 U.S. 569 (1966), contend that property held for a long period of time is clearly capital. They quote from Malat as follows: * * * The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand ( Corn Products Co. v. Commissioner, 350 U.S. 46, 52) and "the realization of appreciation in value accrued over a substantial *196 period of time" on the other. ( Commissioner v. Gillette Motor Co., 364 U.S. 134). * * * They then urge that the Supreme Court has approved Municipal Bond Corporation v. Commissioner, 341 F. 2d 683 (C.A. 8, 1965), and reversed the line of cases beginning with Rollingwood Corporation v. Commissioner, 190 F. 2d 263 (C.A. 9, 1951). Respondent replies to those arguments by the contention that the number of years of holding property is not determinative and that no mathematical devices, such as measuring the holding period, should be used alone to determine the purpose for holding property at the time of its sale. Respondent concludes his argument as follows: Therefore, the respondent respectfully submits that, although the Supreme Court's decision in Malat, supra, may have finally established the meaning of the word "primarily" as that understood and adopted in its comomn usage, being "of first importance" or "principally," it is the concurrent consideration of all elements which aids the Court in determining whether the principal purpose, and that of first importance, for the holding of property was for sale to customers. The *197 innumerable cases in which the original intended purpose of the acquirer gave way to another are sufficient proof that this Court is warranted in according no greater weight to the "holding period" than that extended by it prior to the rendition of the Malat decision. If the Supreme Court had felt otherwise, it would have undertaken to express itself specifically. We agree with respondent and are persuaded that to determine petitioners' primary, principal or of-first-importance purpose of holding the property at the time of sale, we should consider all of the factors which cast light on the matter, not merely the length of time of petitioners' ownership. See Municipal Bond Corporation, 46 T.C. 219 (May 16, 1966). This we have done. We hold that petitioners have not sustained their burden with respect to the Douglas and Hopkins property. We consider the following statement appearing at page 1004 of the Margolis case, supra, particularly applicable to the present factual situation: If the purpose of the acquisition and holding and the only manner in which benefit was to be *198 realized from the property acquired was ultimate sale at a profit, its acquisition and holding by a dealer such as taxpayer must be considered to have been for sale to customers in the ordinary course of business. It is our holding, therefore, that the gains arising from the sales of the Douglas and Hopkins property should be taxed as ordinary income. It must also be decided whether the reinvestments of condemnation proceeds in the West Silver Spring Drive property and the West Forest Home Avenue property qualified for nonrecognition of gain treatment under section 1033 of the Internal Revenue Code of 1954. The applicable part of section 1033 provides as follows: (a) General Rule. - If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted - (1) Conversion Into Similar Property. - Into property similar or related in service or use to the property so converted, no gain shall be recognized. * * *
(A) Nonrecognition of gain. - *199 If the taxpayer * * * for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, * * * at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. Respondent has determined that the two reinvestments with which we are concerned were nonqualifying because of the presence of rent-producing structures on the new properties, and that the gain should therefore be recognized at ordinary income rates since the condemned land was being held for sale in the ordinary course of business. Respondent's position is based upon section 1.1033(a)-2(c)(9)(i) of the Regulations which provides that there is no investment in property similar in character and devoted to a similar use if the proceeds of unimproved real estate, taken upon condemnation proceedings, are invested in improved real estate. *200 The general test to be applied in a qualification under section 1033 controversy was recently set forth in Filippini v. United States, 318 F. 2d 841, 844 (C.A. 9, 1963), and the test was stated as follows: The purpose of the statute is to relieve the taxpayer of unanticipated tax liability arising from involuntary condemnation of his property, by freeing him from such liability to the extent that he re-establishes his prior commitment of capital within the period provided by the statute. The statute is to be liberally construed to accomplish this purpose. On the other hand, it was not intended to confer a gratuitous benefit upon the taxpayer by permitting him to utilize the involuntary interruption in the continuity of his investment to alter the nature of that investment tax free. Therefore, whether the acquired property is "similar or related in service or use" to the condemned property turns upon whether in all the circumstances it represents a substantial continuation of the taxpayer's prior commitment of capital, or a departure from it. * * *
The test is a practical *201 one. The trier of fact must determine from all the circumstances whether the taxpayer has achieved a sufficient continuity of investment to justify non-recognition of the gain, or whether the differences in the relationship of the taxpayer to the two investments are such as to compel the conclusion that he has taken advantage of the condemnation to alter the nature of his investment for his own purposes. We find that petitioners have not taken advantage of the condemnation to alter the nature of their investment. Upon application of the principles discussed with regard to the Douglas and Hopkins property to the facts surrounding the ownership of the condemned property, we consider the condemned property as real estate which was being held primarily for sale in the ordinary course of business. Therefore, any gains recognized as a result of the condemnation award will be taxed at ordinary income rates. The nature of the investment in the condemned property was thus an investment in land which thereafter constituted part of a dealer's inventory. It is our opinion that the evidence of record supports the conclusion that the investments in the West Silver Spring Drive property and the *202 West Forest Home Avenue property were identical in nature to the investment in the condemned property. All of the foregoing parcels of real estate were zoned for local business, and they were purchased with the intention to resell at a profit after sufficient appreciation in value had occurred due to the commercial growth of the city. The presence of shoddy and insignificant rent-producing structures on the reinvestment properties does not have the effect of disqualifying the transactions for nonrecognition treatment. William was clearly uninterested in the potential rental income of the properties, and the amounts actually received were minimal. The structures actually had a negative value as they reduced the value of the land for commercial development. We do not believe that the unimproved - improved language contained in the previously mentioned Regulation applies to this type of situation. The improvements on the acquired properties were of such a nature that for all practical purposes the properties were unimproved. The expenditures for remodeling and repairs were made at a subsequent time and only after William was persuaded that demolishing the buildings would be more expensive *203 than a continuation of the rentals made possible by certain improvements. The potential appreciation in value of the land itself was of paramount concern to the petitioners, and in this respect we see no difference between the original investment in the condemned property and the reinvestments in controversy. We hold, therefore, that the disputed reinvestments qualified under section 1033 and that the gains allocable thereto should not be recognized. We have concluded that petitioners have made qualifying reinvestments under sections 1033 in the amount of $103,000. Since the preceding amount does not exhaust the total amount of $129,497.25 received from the condemnation, it remains necessary to determine the amount of gain properly recognizable as ordinary income. Petitioners would calculate the recognizable gain in the following manner: Total condemnation proceeds re-
ceived
$129,497.25
Less: Expenses of obtaining con-
demnation award
12,060.00
Net condemnation proceeds
$117,437.25
Qualifying reinvestments
103,000.00
Recognizable gain
$ 14,437.25
Respondent contends that the expenses of obtaining the condemnation award should not be deducted from *204 the gross proceeds, thus finding a recognizable gain of $26,497.25. Section 1033(a)(3)(A) states that "the gain shall be recognized only to the extent that the amount realized upon such conversion * * * exceeds the cost of such other property * * *" While the regulations under section 1033 do not define "amount realized," it would seem illogical not to allow clearly related expenses to offset the amount of gain to be recognized on a transaction. It has been held that the gross amount received from a condemnation award is reduced by expenses necessary for the award's procurement in computing profits arising therefrom. Isaac G. Johnson & Co. v. United States, 149 F. 2d 851 (C.A. 2, 1945); William Justin Petit, 8 T.C. 228, 236 (1947); Washington Market Co., 25 B.T.A. 576, 582 (1932). Respondent cites Columbus Die, Tool and Machine Co., T.C. Memo. 1952-312, for the proposition that fees paid to a lawyer and real estate experts in connection *205 with a condemnation proceeding are not deductible expenses but constitute capital items which in nontaxable transactions must be added to the basis of the new properties constituting qualified reinvestments. The preceding principle would only seem applicable, however, in a situation like that in the Columbus Die case where capital assets were involved and there was no gain recognizable on the transaction for the capital expenses to offset. The present controversy does not involve such a situation. Not only is there recognizable gain which could be offset in part by the related expenses, but we are dealing with non-capital inventory assets. Thus, it would seem that the expenses of obtaining the judicial condemnation award would be deductible in any event as ordinary and necessary business expenses. The exact characterization of these expenses is of no consequence in this case since they will offset ordinary income regardless of classification. We hold, therefore, that the amount realized from the condemnation exceeded the cost of qualifying reinvestments by $14,437.25, and gain should be recognized as ordinary income to this extent. Decision will be entered under Rule 50.